IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NICHOLAS KUHAR, et al., | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | |
| v. | Civil Action No. 16-395 (JBS/JS) |
| PETZL COMPANY, d/b/a PETZEL; PETZL AMERICA, INC. d/b/a PETZL; BAILEY'S CORPORATION; UNLIMITED XYZ CORPORATIONS; UNLIMITED JOHN DOES; UINTAH FASTENER & SUPPLY; THOMPSON MANUFACTURING; PORTEOUS FASTENER COMPANY; BRIGHTON-BEST; QUALITY PLATING; | **OPINION** |
| Defendants. | |

APPEARANCES:

Brett Schneider, Esq.
Kevin P. McCann, Esq.
Matthew Weng, Esq.
Shanna McCann, Esq.
CHANCE & MCCANN LLC
201 West Commerce St.
Bridgeton, NJ 08302
    Attorneys for Plaintiffs

James D. Burger, Esq.
Robert Devine, Esq.
WHITE & WILLIAMS, LLP
Libertyview
457 Haddonfield Road, Suite 400
Cherry Hill, NJ 08002
    Attorneys for Petzl Defendants

C. Scott Toomey, Esq.
Daniel J. Kain, Esq.
LITTLETON PARK JOYCE UGHETTA & KELLY LLP
201 King of Prussia Road, Suite 220

Radnor, PA 19087
      Attorneys for Defendant Thompson Manufacturing


**SIMANDLE, District Judge:**

**I.    INTRODUCTION**

      This is a personal injury case with allegations of a

defective climbing harness manufactured or sold by Defendants.

This matter is before the Court on the motion of Defendant

Thompson Manufacturing ("Defendant," "Thompson" or "TMI") to

dismiss Plaintiffs Nicholas Kuhar ("Kuhar" or "Plaintiff") and

Julie Kuhar's (collectively, "Plaintiffs") Second Amended

Complaint [Docket Item 103] for lack of personal jurisdiction

over TMI. [Docket Item 128.] This motion renews TMI's previous

motion [Docket Item 56], which the Court previously denied

without prejudice before allowing jurisdictional discovery

[Docket Items 84 & 85], which has now been completed. Defendant

Petzl America ("Petzl") submitted a response brief in opposition

[Docket Item 142], in which Plaintiffs joined [Docket Item 144].

TMI submitted a reply [Docket Item 145], as well as a letter

alerting the Court to supplementary authority [Docket Item 168],

to which Petzl responded [Docket Item 177]. For the reasons set

forth below the Court will GRANTxxx the motion to dismiss.

## II. BACKGROUND

As the Court has previously stated, "[o]n December 24, 2013, Plaintiff Nicholas Kuhar was cleaning gutters at a house in Alloway when the 'Micrograb' wire core flip-line safety harness with which he had secured himself failed, causing him to fall thirty-seven feet onto the concrete below[,]" whereupon he sustained several serious injuries. [Docket Item 84 at 2.]

The Second Amended Complaint alleges that Plaintiff was an end-user who was injured by a defective "safety harness" containing a "carabiner" (also referred to as a "rope-grab" or the "MicroGrab" in the briefing [Docket Item 128-3 at 6 n.3]) that was "manufactured, designed, produced, advertised, promoted, sold, distributed and otherwise introduced into the stream of commerce by the specifically named defendants." [Docket Item 103 at 1 ¶ 1.] Plaintiffs allege that the safety harness "failed to prevent personal injury to its user through a defective carabiner and bolt; [f]ailed to adequately warn its user of the dangers inherent with the safety harness; [f]ailed to adequately warn its user of the risks involved with using the safety harness; and [o]therwise completely failed to perform in the manner as advertised." Id. at 1-4 ¶¶ 2-9 (allegations referred to collectively as "the Defects"). With regard to TMI specifically, Plaintiffs allege that TMI "advertised, promoted, sold, distributed, and otherwise introduced into the stream of

commerce the safety harness. . . . including all of its

components[.]" Id. at 2 ¶ 5.

The Second Amended Complaint also states that TMI is "a

corporation organized and existing under the laws of the State

of Utah, with its principal place of business located in

Clearfield, Utah." Id. at 4 ¶ 8.

As the Court previously stated in its Opinion denying

without prejudice TMI's earlier motion to dismiss pursuant to

Fed. R. Civ. P. 12(b)(2):

> [TMI] produced and sold a component part to [Petzl]
> that was allegedly used [in] the Petzl Micrograb
> device that is the subject of the present lawsuit. TMI
> was incorporated in and maintains its principal place
> of business in the State of Utah, where its corporate
> offices and manufacturing facilities are also located.
> TMI's President, Travis Lane, affirms that TMI does
> not own, rent, lease, occupy or maintain any property
> in the State of New Jersey; does not employ anyone or
> conduct any operations in the State of New Jersey;
> does not sell, advertise, market or deliver its
> products to, or derive revenue from sales of its
> products from, the State of New Jersey; has not paid
> income, property or any other tax to the State of New
> Jersey, nor is it registered or licensed to conduct
> business in the state, nor has it authorized anyone to
> act as its agent in the state; and does not and has
> never obtained banking, accounting or legal services
> from companies located in the State of New Jersey.

[Docket Item 84 at 6-7 (internal citations omitted).] The Court

also noted Plaintiffs' and Petzl's contentions (and supportive

documentation) that

> a related company, Rock Exotica, sells similar or
> identical products in the State of New Jersey, and
> that therefore TMI must be aware that its products are

incorporated into devices that are sold in New
Jersey[;] . . . that the climbing devices shown on
Rock Exotica's website . . . are the same as those
purchased by Petzl from TMI[;] . . . that Rock
Exotica's website directs consumers to two authorized
dealerships in New Jersey where they can purchase Rock
Exotica products[;] . . . that TMI and Rock Exotica
share a founder and owner, Rock Thompson[;] . . . that
the two companies' manufacturing facilities appear to
be located at the same Freeport Center in Clearfield,
Utah[;] . . . that the two companies apparently share
a phone number and website[;] . . . and that a number
of employees represent online that they are affiliated
with both companies[.]

[Docket Item 84 at 7-8 (internal citations omitted).]

The parties, having completed jurisdictional discovery

[Docket Item 128-3 at 11 n.5], allege the following additional

relevant facts[1]:

The item Plaintiff bought in New Jersey was purchased from

Defendant Bailey's in January of 2006, and was a "flipline kit"

consisting of "several components: 1) a wire core

flipline/lanyard (i.e., a rope with a core made of wire); 2) an

oval screw link; and 3) a Petzl rope grab." [Docket Item 128-3

at 8, 6.] The rope grab contains a spring-loaded cam, which

(when not under pressure from the tension of an arborist's body

weight) "rotates on an 'axle' consisting of a nut and shoulder

bolt. Plaintiffs here claim the shoulder bolt fractured,

---

[1] The factual allegations stated herein are supported, if not
otherwise noted, by appropriate citations to the record
developed during jurisdictional discovery and attached as
exhibits to the motions and papers presently before the Court.
Those citations are largely omitted from this Opinion.

apparently causing the flipline to lose tension and allowing Mr. Kuhar to fall." Id. at 7-8. Bailey's put together the kit by compiling the separate components and marketing the combination "as a Bailey's flipline kit." Id. at 8. Bailey's purchased the rope grab from Defendant Petzl America. Id. Petzl America "obtained [the rope grab] from TMI, who assembled it at Petzl America's request. . . . TMI manufactured the body and the cam of the Micrograb. TMI did not manufacture the shoulder screw or bolt that allegedly fractured or the nut that secured it. Rather, TMI purchased the nut and bolt as finished products from co-defendant Uintah Fastener & Supply[.]" Id. (internal citations omitted).

With regard to TMI itself, TMI states:

> Since its inception in 1991, TMI has maintained and still maintains its principal place of business in Utah. TMI's corporate offices and manufacturing facilities are located in Utah. TMI never had offices, manufacturing facilities or places of business within New Jersey. It never owned, leased, rented, occupied or maintained any real property within New Jersey. It has never maintained a telephone listing or post office box within New Jersey. In short, TMI has never had any physical connection to the State of New Jersey.
> TMI has never employed anyone within New Jersey. TMI has never sold products to customers in New Jersey. It has never had distributors within the state and has never delivered products to or within New Jersey. TMI has never derived revenue from sales to customers located in New Jersey. TMI has never advertised or marketed in, nor has it directed any advertising or marketing towards, New Jersey residents. TMI has never entered into any contracts in New Jersey. TMI has never exercised any control over

any person, firm or corporation located within the
state.

TMI may have purchased aluminum on two occasions
in 2013-4 from a metals broker who had an address in
New Jersey but may have been physically located in
Europe. Other than those two transactions and the
possibility that products purchased from websites like
Amazon or McMaster have unknown origins that
conceivably could have included New Jersey, TMI has
never even sourced or purchased materials for its
business from companies located in New Jersey.

[Docket Item 128-3 at 12-14.] TMI also again alleges that it has

never had any financial or legal relationships with the State of

New Jersey or any person or entity residing in New Jersey. Id.

at 14.

In its Motion, TMI describes its "[c]orporate [h]istory and

[r]elationship [w]ith Rock Exotica, LLC" as follows:

TMI was incorporated in 1991 pursuant to the laws
of the State of Utah. A Petzl-related entity called
Spirit of St. Luis was TMI's original majority
shareholder. TMI was formed to be a contract
manufacturer for Petzl France[] and its American
distributor. TMI remained an exclusive contract
manufacturer for Petzl France and its American
distributor until 2002-[0]3. In approximately 1998,
TMI began manufacturing rope grabs for Petzl. The
Micrograb was one of the rope grabs TMI manufactured
exclusively for Petzl.

In 2002-[0]3, Rock Thompson purchased the
outstanding shares of TMI and became the sole
shareholder. TMI remained a contract manufacturer for
Petzl but also began to act as a contract manufacturer
for other customers. TMI has never and does not sell
any products to end users. It does not own any
intellectual property.

Mr. Thompson remained the sole shareholder until
TMI's stock was purchased by Rock Exotica, LLC when it
came into existence on December 24, 2012. Through that
transaction, TMI became a wholly owned subsidiary of

Rock Exotica, LLC. TMI remains a wholly owned
subsidiary of Rock Exotica, LLC today.

<u>Id.</u> at 14-15.

The nature of the relationship between parent corporation
Rock Exotica and subsidiary TMI is the subject of much dispute
between the parties. As noted below, at the time of Plaintiff's
purchase of this equipment in January, 2006, TMI and its related
corporation, Rock Exotica Equipment, LLC, existed. Later, Rock
Exotica Equipment was merged into a new entity, Rock Exotica,
LLC, in 2012. For general jurisdiction, the activities of TMI
and Rock Exotica Equipment, LLC and Rock Exotica, LLC (and
whether TMI is the alter ego of either or both entities) will be
relevant. For specific jurisdiction, on the other hand, the
activities of TMI and Rock Exotica Equipment, LLC, pertaining to
the 2006 sale of the climbing harness to Mr. Kuhar in New Jersey
will be relevant, as Rock Exotica, LLC, did not exist in 2006.
As Rock Exotica Equipment's successor, however, Rock Exotica may
be liable to the same extent as Rock Exotica Equipment would
have been.

TMI depicts two companies that share certain commonalities
(as discussed <u>supra</u> and in the Court's earlier Opinion) but are,
in the main, separate: Rock Exotica (unlike TMI) has no
employees, <u>id.</u> at 15; unlike TMI, Rock Exotica "does not
manufacture products" but rather "is a marketing and

distribution company for products used in the fall protection
industry[,]" id., and "markets its products to smaller non-
exclusive distributors" of such products, with 1-3 of its
distributors (since 2012) being located in New Jersey, although
it "does not have dealership or financing agreements with any
distributor of its products[,]" including the New Jersey
distributors. Id. at 15-16. TMI asserts that Rock Exotica, LLC
and TMI "run their business [sic] separately and keep completely
separate books. . . . TMI has customers other than Rock Exotica,
LLC and Rock Exotica, LLC sources products from vendors other
than TMI"[2]; the two companies use their own separate enterprise
computer systems. Id. at 16. Sales and purchase transactions
between the two companies are logged and put into effect without

---

[2] Of the two citations to the evidentiary record in support of
the contention that Rock Exotica, LLC sources products from
vendors other than TMI (namely, Exhibit M, Docket Item 128-17,
at 10-11; and Exhibit O, Docket Item 128-19, apparently in its
entirety), the Court notes that one does not discuss Rock
Exotica, LLC's product sourcing, and the other contains only a
conclusory statement to that effect in TMI's responses to
interrogatories. The Court notes that TMI, in its Reply, again
asserts that it sells its products to Rock Exotica, LLC; Petzl
America; and MSA; and that Rock Exotica "likewise sources its
products from other entities." [Docket Item 145 at 11.] Again,
however, the Court has carefully scrutinized the citations to
the record that TMI provided in support of the latter part of
that assertion, i.e., that Rock Exotica offers for sale products
not manufactured by TMI and does not find evidence in the record
to support that beyond TMI's response to initial interrogatories
stating, "Rock Exotica LLC is a marketing and distribution
company that, among other things, purchases products and
services in arms-length transactions from various sources, one
of which is TMI." [Docket Item 128-19 at 4.]

special consideration that the seller/buyer is one with which
there is a corporate relationship rather than an unrelated
seller/buyer. Id.

TMI notes that, while it is TMI employees who provide
"various administrative services to Rock Exotica, LLC" (as,
again, Rock Exotica, LLC has no employees of its own), this
occurs "pursuant to an administrative services agreement" that
TMI characterizes as "unwritten but arms-length[,]" covering 12
TMI employees at present, who accordingly devote "a portion of
[their] work time" to "serve [the] marketing and distribution
business" needs of Rock Exotica, LLC, (e.g., accounting,
creating sales orders and invoices, and shipping activities).
Id. at 17. In exchange for these services, Rock Exotica, LLC
"makes monthly payments to TMI[,]" the amount of which "is
adjusted on an annual basis and is calculated based on the
number and nature of the individuals whose services are needed,
their roles and responsibilities, and the amount of their time
needed by TMI [sic][3]." Id. at 17-18.

Petzl [Docket Item 142 at 8-18] and Plaintiffs [Docket Item
144] depict the relationship between Rock Exotica, LLC and TMI

---

[3] See Commonwealth v. Johnson, 700 N.E.2d 270, 272 n.5 (Mass.
App. Ct. 1998)("A 'Freudian slip' has been defined as a
'[m]isstatement theorized to reveal unconscious thought or a
conflict or desire of the speaker.' Redden and Beyer, Modern
Dictionary for the Legal Profession (2d ed. 1996).").

differently. They point to the following facts in support of
finding that the two companies are alter egos:

- "The president of TMI, Travis Lane, who is also an owner of
  Rock Exotica, testified that the products TMI manufactures
  for Rock Exotica are marketed in New Jersey. . . . [and]
  that Rock Exotica has [two] authorized dealers who sell the
  TMI[-]manufactured products in New Jersey" as well as the
  Rock Exotica website, which "sells climbing products
  nationwide, including into New Jersey," in contrast to TMI,
  which has no website [Docket Item 142 at 11, 13];
- "Rock Exotica LLC is owned by Rock Thompson (20%) and JPL
  [I]ndustries (80%). Rock Exotica owns 100% of TMI" such
  that the two corporations therefore "have common
  ownership[,]" and "the business decisions for both
  companies are made by the same three people[:] . . . Travis
  Lane, Brandon Lane and Rock Thompson." id. at 11-12;
- "Rock Exotica Equipment, LLC was merged into Rock Exotica,
  LLC in 2012, however both entities traded/trade as 'Rock
  Exotica,'" and one or the other entity, using that as its
  trade name, "has been selling products for 28 years, which
  includes the early 2006 time period when the subject
  Micrograb was sold" and "at all times relevant to this
  case[,]" id.[4];
- "Rock Exotica has no employees. *All* work of Rock Exotica is
  performed by TMI employees" who "are issued a paycheck by
  TMI" for this work; moreover, "TMI employees even determine
  what type [of] work should be done for Rock Exotica"
  including "having a TMI employee determine whether Rock
  Exotica needs to have TMI manufacture more products to sell
  under the Rock Exotica name[,]"; Petzl argues that "Rock
  Exotica exists only through the actions of TMI employees
  who are paid via TMI paycheck for the work. . . . In this
  regard TMI exerts so much control over Rock Exotica that
  Rock Exotica does not meaningfully exist as a separate
  entity . . . [because it] acts . . . exclusively through
  TMI employees," id. at 12;
- Travis "Lane, who is president of TMI and denies any
  employment relationship with Rock Exotica, refers to Rock
  Exotica as 'us' when describing [Rock Exotica's] sales

---

[4] Petzl argues that "TMI's argument that Rock Exotica did not
exist until 2012 is incorrect. Rather Rock Exotica *LLC*, formed
in 2012, merged with the existing Rock Exotica brand, which has
existed continuously for 28 years." Id. at 12.

process [to a New Jersey customer or authorized dealer,]" <u>id.</u> at 13, citing Lane Dep., Docket Item 128-17, at 35 ("They call <u>us</u> up. And they say we would like to buy <u>your</u> product" (emphasis added)); refers to the Rock Exotica website as "our website"; and has an email address ending in "@rockexotica.com" [Docket Item 142 at 13];

- TMI sells its products "to only three customers: Petzl America, MSA, and Rock Exotica" with less than 1% going to MSA, 5% going to Petzl America, and the remainder going to (or "through," <u>id.</u>) Rock Exotica, "showing that Rock Exotica is a mere conduit for TMI to sell the products it manufacture[s,]" <u>id.</u>;

- When asked, if Rock Exotica, LLC has no employees but still places orders for items with TMI for TMI to manufacture, who exactly it is that "the orders from [Rock Exotica] come from," Lane answered as follows:

> So, the orders come from the customers of Rock Exotica. So, we carry an inventory. Say we might have a hundred products at Rock Exotica. And so, the customers of Rock Exotica will come in, and they'll place orders for it. And, you know, you sell out your inventory, then you know that automatically triggers you that you need to make more.
>
> So, we have a shipping individual that works for Thompson Manufacturing. And he'll recognize that. And he'll say to the person responsible for placing the orders, you know, look. We are out. We need to get some more. Can you order some more from Thompson for us.

[Docket Item 128-17 at 14]. Mr. Lane added that a Rock Exotica customer will, for instance, place an order on the Rock Exotica website, but the employee who processes that order will be a TMI employee working for Rock Exotica, LLC under the administrative services agreement, <u>id.</u> at 15;

- The two corporations "are insured under one insurance policy" with TMI paying Rock Exotica's premium for that policy and TMI "also pay[ing] the lease for the space where Rock Exotica exists, to the extent a company with no employees can be said to occupy a space[,]" [Docket Item 142 at 13-14];

- Although Travis Lane "testified that TMI would 'ship' products to Rock Exotica, . . . he later admitted that there is no 'shipping', the product is just moved within the warehouse [where TMI simply stores the products TMI manufactures bearing the Rock Exotica trade name] (by a TMI employee) and shipped to the purchaser (also by a TMI employee)[,]" <u>id.</u> at 14;
- With regard to the alleged "unwritten but arms-length administrative services agreement," for which Rock Exotica apparently pays TMI $90,000 a month, "TMI does not even bill Rock Exotica for the alleged 'administrative services'[,]" perhaps because "TMI and Rock Exotica do not track the work TMI employees perform on behalf of Rock Exotica. Rather, a TMI employee with access to Rock Exotica funds transfers funds from Rock Exotica to TMI[,]" <u>id.</u>, and that Travis Lane described the "alleged 'arm's length' agreement as follows:

> Q: Okay. So, going back to the administrative services agreement, can you tell me what the terms of that agreement are?
> A: The terms of the agreement are that Rock Exotica will pay for any services performed by a Thompson Manufacturing employee.
> Q: Are there any other terms or conditions that you are aware of?
> A: No.

(citing Lane Dep. At 17:3-11), <u>id.</u>)[5];

---

[5] Petzl further argues that Lane's testimony about the amount of time TMI employees devote to performing "administrative services" for Rock Exotica is not credible. <u>Id.</u> at 15. In his deposition, Lane testified that, pursuant to the agreement, twelve TMI employees spend between 10 and 60% of their work-weeks doing work for Rock Exotica, with only "three actually devoting up to 60% of their time." <u>Id.</u> Petzl submits that, even if all twelve worked 60% of their time for Rock Exotica, "this arrangement would mean that Rock Exotica is paying administrative workers at a rate of $150,000 per year, each [given a monthly rate of $90,000]," and submits that, given that most of the twelve TMI employees do not devote 60% of their weeks to Rock Exotica, the annual rate that Rock Exotica pays TMI per administrative worker is even higher. <u>Id.</u> at 15, 15 nn.13-14. Petzl submits that Lane's testimony that Rock Exotica is "a small company" that cannot afford to hire its own employees is belied by its "outlay of over a million dollars a

- "[T]here is no separation or distinction for TMI workers doing work for Rock Exotica. The TMI employees do not account for time spent doing Rock Exotica work. Mr. Lane even admitted that Rock Exotica pays the same amount to TMI each month regardless of how much or little work was done by TMI employees for Rock Exotica in that month[,]" and that TMI employees do work for Rock Exotica in "the same location[,]" at the direction of their TMI-employed managers, id. at 16;

- "Mr. Lane's testimony indicates he views these companies as one and the same[,]" given instances in his testimony described above, and his repeated use of the word "we" when discussing the business operations of Rock Exotica[6] (although he denied employment with Rock Exotica and was produced for his deposition "pursuant to a Fed. R. Civ. P. 30(b)(6) deposition notice" to TMI), and explicitly described "pooling resources," id. at 17-18.

- As far as the specific MicroGrab at issue in this case, TMI asserts that it assembled it and sold it in Utah "to co-defendant Petzl America" and delivered it to Petzl America in Utah in November of 2005, before it passed from Petzl America to Bailey's, where it was subsequently incorporated into the flipline kit Plaintiff bought. [Docket Item 128-3 at 18.] TMI states:

---

year, purportedly for warehouse/administrative work." Id. at 15-16.

    TMI disputes that Petzl's calculations about the rate of pay it collects for the administrative services agreement with Rock Exotica, LLC (and its urged conclusion that the high rate of pay should militate in favor of a finding that no such agreement actually exists) constitute "evidence" that would support a finding that the corporations are alter egos: "Examining counsel's calculation of the value of the services rendered or investigating whether Rock Exotica LLC is getting fair value might be an interesting exercise. But the exercise merely underscores that Rock Exotica LLC *does* pay for the services it obtains. In other words, the *evidence* proves the companies *do* observe corporate formalities and distinctions." [Docket Item 145 at 10.]

[6] See, e.g. Lane Dep., Docket Item 128-17 at 12 ("Q: How does an employee know when they need to do services for Rock Exotica, LLC, an employee of Thompson Manufacturing know? A: So, we keep two separate books. And we have two separate ERP systems . . . .").

> After delivery, TMI would have no contact with or
> control over any relevant part or product. TMI
> had no control over to whom or where Petzl
> America may have sold or shipped products it
> owned. TMI knew that Petzl America was in the
> business of selling products throughout the
> United States, but there is no evidence TMI had
> any more specific knowledge of Petzl's customer
> base or their location.

Id. (internal citations omitted).

The parties, as shown above, have devoted much attention and effort to the relationships between TMI and Rock Exotica, LLC, its parent since 2012. This will indeed be relevant to assessing whether general jurisdiction may be asserted as to TMI when the complaint herein was filed in 2016. Almost nothing has been discovered as to the Rock Exotica Equipment entity that existed in 2006, when Plaintiff purchased the equipment by mail order in New Jersey, which is the connection relevant to specific jurisdiction arising from the 2006 purchase. It appears that TMI manufactured and sold its Micrograb component to Petzl in a Utah transaction in November, 2005, without going through Rock Exotica Equipment. Defendant Petzl America is alleged to be a wholly-owned subsidiary corporation of Petzl Company, a limited liability corporation of the French Republic, with its principal place of business in Crolles, France. Petzl America is alleged to have its principal place of business in West Valley City, Utah. (Second Amended Complaint, ¶¶ 3 & 4.) Petzl America distributed the equipment to Defendant Bailey's Corporation, a

California corporation with its principal place of business in Woodland, California. (Id. ¶ 5.) TMI's Micrograb was incorporated by Bailey's into the flipline kit, which Bailey's sold to Mr. Kuhar by mail order shipped to Bridgeton, New Jersey, in 2006. It does not appear from these facts that either Rock Exotica Equipment or TMI had any connection to New Jersey in the 2006 transaction of the allegedly defective flipline kit, as discussed below. [Bailey's Invoice, Jan. 18, 2006, at Toomey Decl, Ex. C (Docket Item 128-7).]

## III. STANDARD OF REVIEW

To defeat a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), Fed. R. Civ. P., "the plaintiff bears the burden of establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction." Provident Nat. Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987). Ultimately, to meet its burden to demonstrate that the exercise of jurisdiction over the parties would be proper, the plaintiff must proffer evidence of jurisdiction through sworn affidavits or other competent documents. See Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009); IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 257 (3d Cir. 1998); In re Nazi Era

Cases Against Ger. Defendants Litig., 320 F. Supp. 2d 204, 214-15 (D.N.J. 2004).

Where no evidentiary hearing is held, a plaintiff need only establish a prima facie case of personal jurisdiction and is "entitled to have [his] allegations taken as true and all factual disputes drawn in [his] favor." O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007)(quoting Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004)). See also Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002)("in reviewing a motion to dismiss under Rule 12(b)(2), we 'must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff.' Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992).").

## IV.  DISCUSSION

Federal Rule of Civil Procedure 4(e) allows a district court to assert personal jurisdiction over a non-resident defendant to the extent permitted by the law of the state where the district court sits. See Fed.R.Civ.P. 4(e). New Jersey law permits the exercise of jurisdiction to the extent allowed by the Constitution, making the current inquiry whether the Court can exercise jurisdiction without offending the Due Process

Clause of the Fifth Amendment. <u>Miller Yacht Sales, Inc. v.</u>
<u>Smith</u>, 384 F.3d 93, 97 (3d Cir. 2004).

The Due Process clause requires that Plaintiff establish
that the Corporate Defendants have "certain minimum contacts
with [New Jersey] such that the maintenance of the suit does not
offend traditional notions of fair play and substantial
justice." <u>Int'l Shoe v. Washington</u>, 326 U.S. 310, 316 (1945);
<u>Pinker v. Roche Holdings Ltd.</u>, 292 F.3d 361, 368 (3d Cir. 2002).
A plaintiff must establish either that "the cause of action
arose from the defendant's forum-related activities (specific
jurisdiction) or that the defendant has 'continuous and
systematic' contacts with the forum state (general
jurisdiction)." <u>Mellon Bank (EAST) v. DiVeronica Bros.</u>, 983 F.2d
551, 554 (3d Cir. 1993).

The Court reiterates its earlier discussion of personal
jurisdiction in the Opinion of June 9, 2017 [Docket Item 84]:

> The personal jurisdiction inquiry traditionally
> requires an examination of whether its exercise over a
> defendant is permissible under both the state's long-
> arm statute and the Due Process Clause of the
> Constitution. But if the state's personal jurisdiction
> statute permits the exercise of jurisdiction to the
> fullest limits of due process, as is the case here in
> New Jersey, the two jurisdictional inquiries in this
> case collapse into one: whether the exercise of
> jurisdiction comports with due process. <u>Imo Indus.</u>,
> <u>Inc. v. Kiekert AG</u>, 155 F.3d 254, 259 (3d Cir. 1998);
> <u>DeJames v. Magnificence Carriers, Inc.</u>, 654 F.2d 280,
> 284 (3d Cir. 1981).
>         As has often been repeated, the Due Process
> Clause of the Constitution permits the exercise of

personal jurisdiction when there are "minimum
contacts" between a non-resident defendant and the
forum state such that "maintenance of the suit does
not offend traditional notions of fair play and
substantial justice." J. McIntyre Machinery, Ltd. V.
Nicastro, 131 S. Ct. 2780, 2787 (2011) (quoting Int'l
Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). A
court may exercise either general jurisdiction or
specific jurisdiction over a defendant as long as it
is consistent with that principle. General
jurisdiction may be asserted over a foreign
corporation even when the cause of action has no
relation to those contacts if the defendant's contacts
with the forum are so "continuous and systematic" as
to render them essentially "at home" in the forum
state. Daimler AG v. Bauman, 134 S. Ct. 746, 754
(2014); Goodyear Dunlop Tires Operations, S.A. v.
Brown, 131 S. Ct. 2846, 2851 (2011); Helicopteros
Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408,
414 (1984). If an out-of-state defendant's contacts
with the forum are insufficiently substantial to
establish general jurisdiction, a court may still
assert specific jurisdiction if the suit "aris[es] out
of or relate[s] to the defendant's contacts with the
forum." Helicopteros, 466 U.S. at 414, n.8. The
inquiry here becomes whether the defendant has
"purposefully directed" his activities at residents in
the forum state, Burger King Corp. v. Rudzewicz, 471
U.S. 462, 472 (1985), or whether there was "some act
by which the defendant purposefully avail[ed] itself
of the privilege of conducting activities within the
forum State, thus invoking the benefits and
protections of its laws." Hanson v. Denckla, 357 U.S.
235, 253 (1958).

[Docket Item 84 at 4-6.] To assert specific jurisdiction a

plaintiff must establish that (1) the defendants "purposely

directed [their] activities at New Jersey; (2) the

litigation "arise[s] out of or relate[s] to" at least one

of the defendants' activities in New Jersey; and (3) the

exercise of jurisdiction comports with traditional notions

of "fair play and substantial justice." O'Connor, 496 F.3d at 316 (citing Burger King, 471 U.S. at 472).

The Court continues to adhere to its previously-stated position that Plaintiffs have not carried their burden to establish that New Jersey would have general jurisdiction over TMI directly. [Docket Item 84 at 7-8.] The Court previously granted jurisdictional discovery with regard to the question of whether New Jersey would have specific jurisdiction over TMI. Id. at 8-11.

As the Court previously stated:

> Even where a corporation does not come into direct contact with the forum state, "minimum contacts" may exist and specific jurisdiction may lie where the corporation "delivers its products into the stream of [commerce] with the expectation that they will be purchased by consumers in the forum state." World-Wide Volkswagen, 444 U.S. at 298. In the absence of a clear directive as to what level of engagement the corporation must have with the forum state in order to rise to the level of constitutionally adequate "minimum contacts" under the stream of commerce theory, the Third Circuit Court of Appeals instructs courts to consider the standards enunciated in the plurality opinions by Justices O'Connor and Brennan in Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102 (1987). See Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 205 (3d Cir. 1998). In practice, this means that courts first look for "the placement of a product into the stream of commerce . . . accompanied by some additional conduct of the defendant that may indicate an intent or purpose to serve the market in the forum State," such as "designing the product for the market in the forum State . . . [or] establishing channels for providing regular service to customers in the forum State." Pennzoil, 149 F.3d at 206 (citing Asahi Metal, 480 U.S. at 112 (O'Connor, J.)). In the alternative,

> courts then apply Justice Brennan's standard, which
> finds minimum contacts where the "defendant . . . has
> placed goods in the stream of commerce [and] benefits
> economically from the retail sale of the final product
> in the forum State, and indirectly benefits from the
> State's laws that regulate and facilitate commercial
> activity." <u>Pennzoil</u>, 149 F.3d at 207 (citing <u>Asahi
> Metal</u>, 480 U.S. at 117 (Brennan, J., concurring)).

[Docket Item 84 at 8-9.]

The parties have pointed the Court's attention toward the recent case of <u>Shuker v. Smith and Nephew, PLC</u>, 885 F.3d 760 (3d Cir. 2018) [Docket Items 168 & 177]. In that case, the Third Circuit discussed the "stream of commerce theory" of specific personal jurisdiction, defining it as a theory finding specific personal jurisdiction "over a non-resident defendant when that defendant 'has injected its goods into the forum state indirectly via the so-called stream of commerce,' rendering it foreseeable that one of the defendant's goods could cause injury in the forum state." <u>Shuker</u>, 885 F.3d at 780 (citing <u>D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.</u>, 566 F.3d 94, 104 (3d Cir. 2009)).

Looking at the recent and less-recent Supreme Court precedents of <u>J. McIntyre Mach., Ltd. v. Nicastro</u>, 564 U.S. 873, 877-85 (2011)(plurality opinion) and <u>Asahi Metal</u>, 480 U.S. at 108-13 (plurality opinion), the Third Circuit stated:

> A plurality of Supreme Court Justices has twice
> rejected the stream-of-commerce theory . . . stating,
> in a manner consistent with our own case law, that
> plaintiffs must instead rely on 'some act by which the

> defendant purposefully avails itself of the privilege
> of conducting activities within the forum State, thus
> invoking the benefits and protections of its laws,'
> <u>Asahi</u>, 480 U.S. at 109; see <u>D'Jamoos</u>, 566 F.3d at 102-
> 03. Indeed, the Supreme Court has recently held that
> "[t]he bare fact that [a non-resident defendant]
> contracted with a [resident] distributor is not enough
> to establish personal jurisdiction in the State."
> <u>Bristol-Myers Squibb Co. v. Superior Court</u>, --- U.S. -
> --, 137 S.Ct. 1773, 1783 (2017). We thus have no cause
> to revisit our Court's precedent on this issue, and we
> decline to adopt the Shukers' stream-of-commerce
> theory of specific personal jurisdiction.

<u>Shuker</u>, 885 F.3d at 780. The Court went on to hold that the

allegations that the defendant undertook efforts "to exploit a

national market" that "necessarily included Pennsylvania" were

insufficient to establish "our Circuit's requirement of

purposeful availment: 'what is necessary is a deliberate

targeting of the forum,' <u>O'Connor</u>, 496 F.3d at 317[.]" <u>Shuker</u>,

885 F.3d at 780.

However, the court in <u>Shuker</u> went on to order

jurisdictional discovery on an "alter ego" theory of personal

jurisdiction where the plaintiffs' "allegations" "suffice[d] to

make a prima facie showing of personal jurisdiction" in that

they

> paint[ed] a plausible picture of control by PLC over
> Smith & Nephew: the two companies' decisionmaking is
> integrated, PLC has authority over Smith & Nephew's
> strategic business decisions, PLC pays for the
> development of Smith & Nephew's products, and
> executives from both companies work together to make
> decisions regarding Smith & Nephew's hip systems, as
> shown in a 2012 Smith & Nephew press release that
> directed investor and media inquiries not to Smith &

Nephew employees, but to PLC executives. Given that no
party disputes that personal jurisdiction exists over
Smith & Nephew as PLC's subsidiary in Pennsylvania,
the Shukers' allegations, taken as true and in
isolation, would suffice to show that PLC controlled
Smith & Nephew, that Smith & Nephew was PLC's agent,
and that personal jurisdiction must exist over both
Smith & Nephew and PLC in Pennsylvania.

Shuker, 885 F.3d at 781. Recognizing that many of these facts

were in dispute, the Third Circuit remanded for jurisdictional

discovery and stated that, "[i]f evidence adduced from such

discovery supports the conclusion that personal jurisdiction is

proper as to PLC, then the Shukers may seek leave under Federal

Rule of Civil Procedure 15(a)(2) to amend their Third Amended

Complaint to join PLC as a co-defendant." Id. at 782 n.21.

Similarly, this Court previously ordered jurisdictional

discovery because Plaintiffs and Petzl adduced evidence

"connecting Defendant TMI with non-party Rock Exotica": namely,

"that the parties share a founder, a phone number, and a

website, appear to be located at the same place, and may share

employees and common ownership[.]" [Docket Item 84 at 9-10.] The

Court cautioned that this was "not enough to establish personal

jurisdiction over TMI by a preponderance of the evidence, even

if there would be enough evidence of connections with the state

of New Jersey to establish personal jurisdiction over Rock

Exotica[,]" id. at 10, even where Petzl and Plaintiffs adduced

evidence showing that "Rock Exotica[] sells similar or identical

products in the State of New Jersey, and that therefore TMI must

be aware that its products are incorporated into devices that

are sold in New Jersey" where "the climbing devices shown on

Rock Exotica's website . . . are the same as those purchased by

Petzl from TMI, and that Rock Exotica's website directs

consumers to two authorized dealerships in New Jersey where they

can purchase Rock Exotica products," id. at 7-8. As the Court

cautioned:

> Even where a subsidiary corporation may have
> sufficient contacts with the forum state to establish
> personal jurisdiction, a plaintiff must show "more
> than mere ownership" in order to impute those contacts
> to the parent company. Seltzer v. I.C. Optics, Ltd.,
> 339 F. Supp. 2d 601, 609 (D.N.J. 2004); Pfundstein v.
> Omnicom Group, Inc., 666 A.2d 1013, 1016 (N.J. App.
> Div. 1995). "The activities of a parent company are
> imputed to the subsidiary only if the subsidiary is
> the parent's agent or alter ego so that the
> independence of the separate corporate entities was
> disregarded." Fisher v. Teva PFC SRL, 212 F. App'x 72,
> 76 (3d Cir. 2006)(citing Lucas v. Gulf & Western
> Indus., Inc., 666 F.2d 800, 806 (3d Cir. 1981)).

[Docket Item 84 at 10.]

With this overview in mind, the Court turns to the parties'

specific arguments.

Petzl (in whose opposition [Docket Item 142] Plaintiffs

join [Docket Item 144]) advances three major streams of argument

in support of a conclusion that TMI has sufficient contacts with

New Jersey such that TMI's motion to dismiss should be denied.[7]

First, Petzl argues that TMI itself has sufficient minimum contacts with New Jersey that would give rise to specific personal jurisdiction. [Docket Item 142 at 19-21.] Second, Petzl argues that TMI is subject to specific personal jurisdiction under a stream-of-commerce theory. [Docket Item 142 at 21-29.] Finally, Petzl argues that TMI is subject to jurisdiction in New Jersey because Rock Exotica, its alter ego, is subject to jurisdiction in New Jersey. [Docket Item 142 at 8-18.]

**A. TMI's direct contacts**

Petzl argues that TMI's contacts with New Jersey are enough to confer specific personal jurisdiction in this action. The Court disagrees.

Petzl cites the fact that TMI has sourced aluminum from a New Jersey-based supplier on two occasions (both occurring years after Plaintiff purchased the kit containing the rope grab), and the fact that TMI may have sourced other parts or supplies from

---

[7] Petzl also argues that TMI waived its personal jurisdiction challenge by producing Rock Thompson for a deposition but then instructing him not to answer questions relating to personal jurisdiction. [Docket Item 142 at 29-31.] While TMI disputes both this characterization and Petzl's proposed consequences, the Court ultimately concludes that imputing jurisdiction based on this alleged failure would not be appropriate, especially where the answers Thompson would or could have provided do not appear, to this Court, to alter the crux of the Court's analysis regarding the relationship of Rock Exotica, LLC to the claims at issue here. See Section IV.C., infra.

companies located in (or with ties to) New Jersey (including, e.g., Amazon).

These contacts are unrelated to the claims, transactions, and injuries at issue in this case, as is necessary for specific jurisdiction to be established. See O'Connor, 496 F.3d at 318 ("Identifying some purposeful contact with the forum is but the first step in the specific-jurisdiction analysis. The plaintiffs' claims must also 'arise out of or relate to' at least one of those contacts." (citations omitted)).

**B. Stream-of-commerce theory**

Petzl next argues that, based on the line of cases beginning with World-Wide Volkswagen, specific personal jurisdiction over TMI is appropriate because it placed the rope-grab into the stream of interstate commerce from Utah. [Docket Item 142 at 21-28.]

As stated previously, controlling precedent indicates that simply placing an item into the stream of commerce, even where it is foreseeable that the item will end up in the forum state, is not enough to establish the "purposeful availment" required to establish the requisite minimum contacts for specific jurisdiction. See Shuker, 885 F.3d at 780; O'Connor, 496 F.3d at 317 (citing Burger King, 471 U.S. at 472, and Hanson, 357 U.S. at 253).

In <u>Shuker</u>, the Third Circuit rejected as insufficient to establish the requisite "purposeful availment" or "deliberate targeting of the forum" the allegation that "PLC sold its products through Smith & Nephew in Pennsylvania as part of its efforts to sell products in the United States generally--not in Pennsylvania specifically." <u>Shuker</u>, 885 F.3d at 780. That is more than what is presently alleged in this case, specific to <u>Kuhar's</u> claims, which amounts to only the allegation that TMI expected (or reasonably should have expected) that Petzl would sell the rope grab TMI manufactured at Petzl's request wherever Petzl chose, a universe that could logically include New Jersey.

Accordingly, the Court finds that TMI did not itself have the requisite minimum contacts with New Jersey to rise to the level of purposeful availment of the benefits of doing business in New Jersey; nor did TMI deliberately target New Jersey when it manufactured and sold the rope grab to Petzl in 2005, which is the transaction that ultimately led to the claims Kuhar brings.

### C. Alter ego of Rock Exotica

Finally, Petzl argues that jurisdiction is appropriate over TMI because jurisdiction would be appropriate over Rock Exotica, which is TMI's alter ego. Petzl argues that "Rock Exotica is

subject to personal jurisdiction[8] in New Jersey because it

markets to consumers in New Jersey, has an interactive website

where New Jersey residents can purchase products from Utah,

interacts with retailers/wholesalers in New Jersey to whom it

ships products for retail sale, and has two authorized dealers

within New Jersey to sell its products at retail" [Docket Item

142 at 8], and that TMI and Rock Exotica are alter egos.

TMI advances several distinct arguments in opposition: the

first is that the "alter ego" doctrine only applies to exercise

jurisdiction over a parent corporation when jurisdiction already

exists over a subsidiary corporation, and does not apply in the

reverse situation to exercise jurisdiction over a subsidiary

where jurisdiction exists over the parent. [Docket Item 168 at

2, citing Shuker, 885 F.3d at 780.] Next, TMI argues that Rock

Exotica and TMI are not sufficiently related for the "alter ego"

doctrine to apply. [Docket Items 128-3 at 35-40; 145 at 9-11;

168 at 2.] Finally, TMI argues that even if TMI and Rock Exotica

are alter egos, there is no basis for New Jersey jurisdiction in

this action over Rock Exotica either, and accordingly, none can

be imputed to TMI. [Docket Items 128-3 at 40-41; 145 at 6-8; 168

at 2.] On this last point, TMI argues that the Court need not

---

[8] Petzl does not specify whether it argues that Rock Exotica is
subject to general personal jurisdiction in New Jersey or
specific personal jurisdiction in New Jersey in this matter, as
TMI notes. [Docket Item 145 at 6.]

engage in a full analysis of whether Rock Exotica, LLC and TMI
are alter egos, because the Court would not have personal
jurisdiction over Rock Exotica, LLC. With regard to general
jurisdiction, TMI argues, "Rock Exotica, LLC is a Delaware
Corporation that came into existence in 2012 and that has always
maintained its principal place of business in Utah. Rock
Exotica, LLC is in no way 'at home' in New Jersey and,
therefore, is not subject to general jurisdiction there. See
Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014)." [Docket Item
145 at 6 n.6.] TMI similarly argues that specific jurisdiction
would not exist as against Rock Exotica, LLC, because Kuhar's
claims do not arise out of or relate to Rock Exotica, LLC's
contacts with New Jersey, and because it would be inappropriate
to treat Rock Exotica, LLC and its alleged "brand" predecessor,
Rock Exotica Equipment, as the same company. Id. at 9.

It is this last argument that the Court finds persuasive
and, ultimately, dispositive. The Court finds that, regardless
of whether TMI and Rock Exotica, LLC ought to be considered
alter egos, jurisdiction would need to exist over Rock Exotica,
LLC, in order for it to be imputed to TMI, and the Court cannot
fairly say that Plaintiffs have carried their burden of
demonstrating that Rock Exotica, LLC would be subject to
personal jurisdiction in New Jersey in this case. Accordingly,
the nature of the relationship between those two companies will

not serve to extend jurisdiction to TMI. Thus, it is not

decisive that the Court finds compelling several of the factors

advanced by Petzl in favor of finding that TMI and Rock Exotica,

LLC are alter egos, as Rock Exotica, LLC, appears to be no more

than the marketing, distribution, and sales arm of TMI's

manufacturing business and the two companies have more in common

than not.[9]

---

[9] See Petzl Br., Docket Item 142 at 16, 18 ("While there may be
transfer of money from Rock Exotica to TMI, that transfer
[pursuant to the alleged unwritten administrative services
agreement] may accomplish nothing more than shifting funds from
a company that transacts nationwide business to a business that
claims it transacts business only within the state of Utah. . .
. [T]he overwhelming evidence [shows] that Rock Exotica is
simply a mere conduit for TMI to sell 94% of all items it
manufactures, which is accomplished entirely by TMI employees. .
. . [O]nly TMI employees create, receive and then process the
orders [between the two companies] . . . . Rock Exotica exists
for the exclusive purpose of selling TMI manufactured products.
Rock Exotica only sells products manufactured by TMI, and 94% of
products manufactured by TMI are sold by Rock Exotica. TMI
exerts so much control that the two companies do not exist
separately, and the independence of Rock Exotica is totally
disregarded.").

    Furthermore, the Court notes that TMI asserts, without
substantial evidentiary support, that Rock Exotica "sources its
products from other entities [than TMI]." [Docket Item 145 at
11.] See n.2, supra. Under the circumstances, where the rest of
the record suggests that Rock Exotica, LLC exists to sell the
products manufactured by TMI, perhaps because TMI no longer
serves as a "contract manufacturer" for Petzl, this evidence is
de minimis and would not support a finding that the two
companies are not alter egos, contrary to TMI's argument that
the alleged existence of "separate and distinct chains of
distribution involving each company (but not both) "leave[s] no
room for doubt that the two companies operate independently"
regardless of "[w]hether each chain of distribution is
financially large or small." [Docket Item 145 at 11.]

The Court will, therefore, for purposes of this Motion, assume that Plaintiff can demonstrate that TMI and Rock Exotica are alter egos.

### D. General and Specific Jurisdiction over TMI and Rock Exotica, LLC

As stated above, jurisdiction over a non-resident defendant must be either general or specific. General jurisdiction over a corporation lies where the corporation is "essentially at home" in the forum state because its affiliations with that state are "so 'continuous and systematic[.]'" Daimler, 571 U.S. at 754 (citing Goodyear Dunlop Tires Ops., S.A. v. Brown, 564 U.S. 915, 919 (2011)). The undisputed evidence suggests that Rock Exotica, LLC is "at home" in Utah and would be subject to general personal jurisdiction there. Rock Exotica, LLC's base of operations is in Utah--one of its many commonalities with TMI-- and the work that is done by it (or on its behalf by TMI employees) is done in Utah. Cf. Daimler, 571 U.S. at 129-30 (discussing Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 448 (1952), which held that Ohio had general jurisdiction over the defendant 'without offending due process" "because Ohio was the corporation's principal, if temporary, place of business" (internal citations omitted)). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent

place, one in which the corporation is fairly regarded as at home." Goodyear, 564 U.S. at 924. Where a "foreign subsidiary[y is] 'in no sense at home in [the forum state],'" the Supreme Court has held that that subsidiary "could not be required to submit to the general jurisdiction of that State's courts." Daimler, 571 U.S. at 757 (quoting Goodyear, 564 U.S. at 929). Here, it appears effectively beyond question that neither TMI nor Rock Exotica, LLC, is "at home" in New Jersey, and that Plaintiffs have not demonstrated that personal jurisdiction over either entity is appropriate in New Jersey.

Turning, then, to specific jurisdiction, an essential element is that the claim at issue in the instant case must arise from (or relate to) the "minimum contacts" the non-resident defendant has or had with the forum state. Here, Rock Exotica, LLC likely (or at least arguably) has such minimum contacts, as it maintains an official relationship with more than one New Jersey "authorized dealer" and markets the products it sells (and that TMI manufactures) to end-users in New Jersey (as well as other states). However, this case does not arise from those contacts, although those contacts are analogous and similar to the contacts that did lead to the claims in this case, involving (as they do) the sale to New Jersey residents of fall-prevention gear manufactured by TMI through an intermediary. And had such gear, manufactured by TMI and sold or

marketed by Rock Exotica, LLC, failed and injured a New Jersey consumer, perhaps specific jurisdiction would exist over Rock Exotica, LLC, and, by extension, TMI (on the basis of its "alter ego" status), given that shipping the product to New Jersey for use by a New Jersey resident would constitute sufficient "minimum contacts" to assert specific jurisdiction. <u>See</u> <u>Columbia Metal Culvert Co. v. Kaiser Indus. Corp.</u>, 526 F.2d 724, 729 (3d Cir. 1975) (holding that "[a] single shipment is sufficient to subject a foreign individual or corporation to personal jurisdiction."); <u>One World Botanicals</u>, 987 F. Supp. at 324 ("defendant's consummation of a business transaction [where it shipped a product into New Jersey] bars it from now arguing that it has not purposefully availed itself of the privilege of doing business in New Jersey,"); <u>see also</u> <u>Spelling Goldberg Productions v. Bodek & Rhodes</u>, 452 F. Supp. 452, 454 (E.D.Pa. 1978)(finding that <u>in</u> <u>personam</u> jurisdiction over non-resident defendants was proper in a trademark infringement action where defendants shipped allegedly infringing merchandise into Pennsylvania.).

The critical difference here is that Rock Exotica, LLC did not sell, vend, or otherwise interact with the product that Mr. Kuhar bought. In fact, Rock Exotica, LLC undisputedly did not exist at the time when Mr. Kuhar bought the kit that included the TMI-manufactured rope grab in 2006.

Petzl contends that the Court should, effectively, compress not merely two corporations (TMI and Rock Exotica, LLC), but actually three--essentially combining, for jurisdictional purposes, TMI (the Utah-only manufacturer), Rock Exotica, LLC (the Utah seller with minimum contacts to New Jersey), and Rock Exotica Equipment, a corporation in Utah that Petzl alleges is, effectively, the precursor to Rock Exotica, LLC, and that may or may not have shared the same or similar minimum contacts with New Jersey.

However, even if the Court were to compress all three corporate entities in this fashion, specific jurisdiction <u>still</u> would not lie in this case. This is so because Kuhar's rope grab was not delivered into his hands in 2006 by or through the actions of Rock Exotica, LLC, Rock Exotica Equipment, or TMI. It is undisputed that the kit Kuhar purchased and subsequently used in New Jersey, containing the TMI-manufactured rope grab, came into his hands by way of co-defendants Bailey's (of California) and Petzl (of France and Utah), and not by way of any transaction or contacts that TMI or any related entity had or may have had with any person or entity in the state of New Jersey. <u>See</u> <u>D'Jamoos</u>, 566 F.3d at 106 ("[T]he fact that <u>other</u> Pilatus planes have followed a certain path to Pennsylvania and other states cannot provide the necessary connection between Pilatus and Pennsylvania to support specific jurisdiction in

this case, because the aircraft involved here reached
Pennsylvania by a series of fortuitous circumstances independent
of any distribution channel Pilatus employed. If we held
otherwise, we impermissibly would remove the 'arising from or
related to' requirement from the specific jurisdiction test and
unjustifiably would treat the stream-of-commerce theory as a
source of general jurisdiction.")(emphasis in original).

        Accordingly, the facts that give rise to the claims at
issue in this case cannot fairly be said, upon consideration of
the jurisdictional record, to arise out of any contacts that
TMI, Rock Exotica, LLC, Rock Exotica Equipment, or any other
sufficiently TMI-related entity had with the state of New
Jersey. See Grimes v. Vitalink Comms. Corp., 17 F.3d 1553, 1559
(3d Cir. 1994)("Unlike establishing general jurisdiction where
the party must be shown to have 'maintained continuous and
substantial forum affiliations,' establishing specific
jurisdiction, at a minimum, requires only that a party be shown
to have committed at least one act in the relevant forum which
is substantially related to the claim being
adjudicated")(internal citations omitted; emphasis added);
O'Connor, 496 F.3d at 318-23 ("The causal connection can be
somewhat looser than the tort concept of proximate causation . .
. but it must nonetheless be intimate enough to keep the quid
pro quo [of the non-resident defendant's enjoyment of the

benefits of its contacts with the forum state] proportional and personal jurisdiction reasonably foreseeable"); see also Gehling v. St. George's Sch. of Med., Ltd., 773 F.2d 539, 544 (intentional infliction of emotion distress claim based on alleged misrepresentation of cause of death "arises out of" contact with Pennsylvania, where defendant allegedly made the misrepresentation). Nor can it fairly be said, under these circumstances, that the claims are sufficiently "related to" the contacts Rock Exotica, LLC; Rock Exotica Equipment; or TMI had or have with the state of New Jersey. See D'Jamoos, 566 F.3d at 104 (plane-crash-related claims do not "arise out of or relate to at least one of Pilatus's purposeful contacts with the forum" of "sending two employees to Pennsylvania to view displays at a potential supplier, and . . . purchasing $1,030,139 in goods or services from suppliers in Pennsylvania during the five-year period preceding this litigation"); Helicopteros, 466 U.S. at 418 ("mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions"). See also Formula One Licensing BV v. Valentine, No. 14-5812, 2016 WL 7175591, at *6 (D.N.J. Dec. 8, 2016)("To establish specific jurisdiction, contacts with the proposed forum must not only meet or exceed constitutionally minimum contacts, they must also be related to

the cause of action.")(citing <u>Reliance Steel Products Co. v.</u> <u>Watson, Ess, Marshall & Enggas</u>, 675 F.2d 587, 588 (3d Cir. 1982)("The initial determination that must be made is whether the claim or cause of action which is being pursued arises from the defendant's forum related activities or from non-forum related activities")); <u>O'Connor</u>, 496 F.3d at 322-24 (finding both: that cause of action would not have arisen but for defendant's contacts with forum state; and that "a meaningful link exists between a legal obligation that arose in the forum and the substances of the plaintiffs' claims[,]" "justif[ying] the exercise of specific jurisdiction as a quid pro quo for Sandy Lane's enjoyment of the right to form binding contracts in Pennsylvania").

For that reason, the Court finds that Plaintiffs have not met their burden of demonstrating that <u>specific</u> jurisdiction can be imputed to TMI on the basis of an alter ego relationship with Rock Exotica, LLC (or an alleged predecessor corporation of Rock Exotica, LLC--i.e., Rock Exotica Equipment--using the same "brand"). Having already dispensed with the proposition that Plaintiffs can demonstrate Rock Exotica, LLC's susceptibility to general personal jurisdiction in New Jersey, the Court therefore finds that jurisdiction may not be extended to TMI on the basis that it is an alter ego of Rock Exotica, LLC, related to the transaction at issue in this case.

Accordingly, the Court does not reach the question of whether exercising jurisdiction over TMI would comport with traditional notions of fair play and substantial justice. <u>See</u> <u>Int'l Shoe</u>, 326 U.S. at 316.

Because Plaintiffs have not established that TMI meets the required minimum contacts to establish specific jurisdiction, is "at home" in New Jersey to establish general jurisdiction, or is the "alter ego" of a company over which general or specific jurisdiction could be asserted in this action, TMI's motion to dismiss pursuant to F.R.C.P. 12(b)(2) is granted.


**V.  CONCLUSION**

For the reasons set forth in the preceding discussion the Court finds that it lacks personal jurisdiction over Defendant TMI, and TMI's motion to dismiss shall be granted. The accompanying Order will be entered.


**August 6, 2018**                    **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     U.S. District Judge