[Doc. No. 225]

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| NICHOLAS KUHAR, et al., | |
| Plaintiffs, | |
| v. | Civil No. 16-0395 (JBS/JS) |
| PETZL CO., et al. | |
| Defendants. | |

### REPORT AND RECOMMENDATION

This matter is before the Court on referral of the "Motion to Dismiss Plaintiff[s'] Complaint Based on Spoliation of Evidence" ("motion") [Doc. No. 225] filed by defendant Uintah Fastener & Supply, LLC ("Uintah"). The Court received the opposition filed by plaintiffs [Doc. No. 228] and Uintah's reply [Doc. No. 232], as well as the support from defendants Petzl America, Inc. and Petzl Company (collectively, "Petzl"), Thompson Manufacturing, Inc. ("TMI"), Quality Plating, and Brighton-Best, Inc. [Doc. Nos. 230, 231, 233, 236]. The Court recently held oral argument.[1] This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1).

Unitah's motion presents the issue of whether spoliation sanctions should be imposed against plaintiffs. Briefly, plaintiff

---

[1] The Court's ruling is based on the parties' written submissions. The parties declined the opportunity to present live testimony.

Nicholas Kuhar alleges the fall that injured him was caused by a defective broken bolt defendants sold or distributed. During the course of the case plaintiffs arranged for both halves of the bolt to be examined by their expert/consultant without defendants being present. Before the bolt was examined under a scanning electron microscope ("SEM"), a cleaner was applied to remove oxidation (rust) and possible debris present on the bolt. Defendants allege this was critical evidence that was spoliated and, therefore, plaintiffs' case should be dismissed. For the reasons to be discussed, the Court finds defendants cannot satisfy their burden of showing relevant evidence was lost or destroyed in bad faith. Since defendants must show plaintiffs acted in bad faith to make out an actionable spoliation claim, the Court respectfully recommends that Unitah's motion be denied. The Court makes the following findings in support of this Recommendation.

BACKGROUND

Plaintiffs Nicholas Kuhar and Julie Kuhar (collectively, "plaintiffs") commenced this action on December 23, 2015 in the Superior Court of New Jersey, Salem County, asserting various claims pursuant to state law against defendants Petzl and Bailey's Corporation ("Bailey's"), including allegations of product defects pursuant to the New Jersey Products Liability Act ("NJPLA"), N.J.S.A. 2A:58C-1-11. See Compl. [Doc. No. 1-1]. The case was removed to federal court on January 22, 2016. The product

underlying the Complaint, a "wire core flip-line safety harness" (hereinafter "safety harness" or "harness"), includes the evidence at issue in this motion – namely, two halves of a broken bolt with a nut attached to the larger half (hereinafter "bolt"). The broken bolt was a component part of the safety harness. See Second Am. Compl. [Doc. No. 102]; Mot. [Doc. No. 225]. Uintah, joined by four co-defendants, alleges relevant evidence was spoliated when one or both halves of the bolt was cleaned on May 10, 2017 during plaintiffs' counsel's undisclosed forensic examination. Unitah seeks the dismissal of plaintiffs' complaint as a sanction. See Mot., Br. at 1-3 [Doc. No. 225-1].

Plaintiffs' claim arises out of an incident which took place on December 24, 2013 in Bridgeton, New Jersey, while Nicholas Kuhar was working on the roof of a barn.[2] TMI Resp., Ex. M at 5 [Doc. No. 231-15]. Plaintiff contends he was "utilizing [defendants'] safety harness to clean gutters" when the "bolt attached to the carabiner of [his] safety harness snapped," causing him to fall thirty-seven (37) feet off the roof and "strike crushed concrete." Second Am. Compl. at ¶ 4. Plaintiff sustained serious injuries from the fall,[3] which is now alleged to have been caused by design

---

[2] Any reference to the singular "plaintiff" throughout this Report and Recommendation shall refer only to Nicholas Kuhar.

[3] Plaintiff alleges he "suffered severe personal injury, including, but not limited to, a crushed sternum, complete tearing of the muscles located in his right shoulder, a broken right thumb, three (3) fractured vertebrae, a fractured pelvis, a fractured hip,

and manufacturing defects associated with the safety harness and its component parts, including the bolt. Id. at ¶¶ 1-11; see Mot., Ex. G at 8-9 [Doc. No. 225-9].

Although the incident occurred on December 24, 2013, the broken "bolt pieces were not discovered for some months after[wards]." Mot., Br. at 1. Plaintiff's son, Michael Kuhar, contends that in or around March 2014, he discovered the bolt in two pieces near the area where plaintiff fell. See Kuhar Dep. 49:22-50:18 [Doc. No. 225-7]. Thus, from December of 2013 until March of 2014, "the bolt pieces were left out in the elements." See Mot., Br. at 1-2. Plaintiff proceeded to store the bolt pieces in a kitchen drawer until turning them over to his attorneys in or around December 2015. Pl. Dep. 238:15-39:12 [Doc. No. 225-6].

During the course of discovery counsel for Petzl requested in writing that plaintiffs preserve evidence and inform them of any planned inspections of the harness or its component parts. See Petzl Supp., Ex. A [Doc. No. 230-3]. Subsequently, in an email dated March 16, 2017, Petzl also requested to inspect plaintiffs' "physical evidence and property." See Doc. No. 231-17. Plaintiffs' counsel responded the next day to inform Petzl their "client ha[d] consented to inspection of the property on [March 21, 2017]," adding that plaintiffs could also "accommodate [Petzl's]

---

damage to his left and right knees, and [a] burst fracture on his spinal cord." Id.

4

inspection of the [harness and its] components" the same day. Id. Ultimately, the "harness, D-Ring, wire flipline, MicroGrab and [broken] bolt" were inspected and photographed in the office of plaintiffs' counsel by John Kurth, President of Petzl America, on March 21, 2017. TMI Resp. at 11-12.

Approximately one month later, plaintiffs' counsel was in contact with their then-expert/consultant, Dr. Robert Iezzi. At his May 23, 2018 deposition, Dr. Iezzi testified he recommended having a metallographic analysis performed on the bolt at Micron, a lab he was familiar with from previous work, because he believed an examination of the two fracture surfaces would help "to attempt to determine why the bolt broke." Iezzi Dep. 110:19-111:10 [Doc. No. 231-13]. Dr. Iezzi testified he sought plaintiffs' counsel's authorization to conduct the examination and later received their approval. Dr. Iezzi added he did not observe or handle the broken bolt prior to the inspection because plaintiffs' counsel "did not want to let the bolt out of their possession." Id. 111:20-23.

On May 10, 2017, Dr. Iezzi met with plaintiffs' counsel at Micron for the planned examination of the bolt, in the absence of defense counsel. See id. 56:12-22. According to Dr. Iezzi, everyone that was involved was "being very careful, per instruction from [plaintiffs' counsel], not to do any destructive testing, not to alter the bolt in any way, shape or form." Id. 57:17-24. Dr. Iezzi asserted the advantage of SEM imaging used to examine the bolt at

Micron "is that you do not have to alter the sample in any way." Id. However, with plaintiffs' counsel's approval, the "fracture face" of one of the bolt pieces "was cleaned with Branson cleaner [] to remove the oxide prior to SEM imaging." Mot., Ex. B [Doc. No. 225-4]; see Iezzi Dep. 113:12-19.

On May 23, 2017, Uintah requested an inspection of plaintiffs' physical evidence in an email sent to plaintiffs' counsel. See Doc. No. 231-24. Plaintiffs agreed to bring the safety harness and related parts to the May 24, 2017 deposition of a "corporate designee of Petzl" scheduled for the following day. Id. Uintah then "arranged for [their] expert, Dr. Pope, to perform a visual (non-destructive) inspection of the items." Id. Defendants contend plaintiffs' counsel did not inform them of the May 10, 2017 examination before, during, or after the expert's visual inspection. See TMI Resp. at 15.

In a September 27, 2017 letter sent to plaintiffs' counsel, Petzl reiterated plaintiffs' duty to preserve "the bolt and that no testing of the bolt be performed without notice to all counsel." See Doc. No. 230-4. Plaintiffs objected to the request, stating: "[w]e will keep the parts here[,] I told you that in the beginning[.] You have no right to control how I prepare my case." See Doc. No. 230-5. Defendants, still unaware of the May 10, 2017 Micron examination, maintain that this and prior letters expressed the understanding plaintiffs would not perform any testing or take

6

any actions which would change the condition of the bolt. Id. Plaintiffs do not dispute they agreed not to do destructive testing on the bolt without first informing defendants.

Following plaintiffs' objection to Petzl's September 27, 2017 request, on October 5, 2017, Petzl filed a motion for protective order which sought to prohibit plaintiffs from performing any testing, destructive or otherwise, without defendants' notice or mutual consent, and to compel plaintiffs to produce reports and documents related to any prior testing. See Doc. No. 123. Plaintiffs filed their opposition on November 8, 2017, disputing Petzl's "broad allegations of potential harm" as unsubstantiated and asserting that plaintiffs "ha[d] made clear since the beginning of [the] litigation that [they] oppose[d] destructive testing." See Doc. No. 133. Plaintiffs further contended that Petzl offered no support for defendants' asserted "right to review and evaluate any non-destructive testing" performed by plaintiffs. Id.

At the same time, the parties were also working towards an "agreed-upon protocol and mutually convenient date for the joint inspection and testing" of the bolt. See TMI Resp. at 15-16. The joint inspection was eventually scheduled for November 13, 2017, at which plaintiffs' new expert/consultant, Dr. Richard Lynch, allegedly "made an off-hand comment overheard by one of the defense experts indicating the appearance of the fracture surface under the SEM looked identical to its appearance at the prior

7

inspection." Id. at 18. Defendants contend this was the first notice they received of the May 10, 2017 testing. Id.

In response to plaintiffs' expert's "inadvertent disclosure," Petzl supplemented its pending motion for protective order to request disclosure of information regarding the May 10, 2017 testing. Id.; see Doc. No. 143. At oral argument on November 29, 2017, Petzl informed the Court it considered the requested "order directing [plaintiffs] not to conduct destructive testing unless on notice" as uncontested, but Petzl still asked the Court to order plaintiffs to disclose details regarding "any prior inspections of any nature whatsoever." Tr. 5:9-18, Nov. 29, 2017 [Doc. No. 167]. Plaintiffs objected to the document request, believing it sought "classic work product . . . protected under privilege." See id. 9:21-25. Upon the Court noting that no party provided a definition for what constituted "destructive testing," Petzl contended no legal definition existed, but also submitted that "cleaning the bolt [would] certainly" be deemed destructive by the defendants. Id. 9:6-13. At the end of the argument, the Court denied Petzl's motion on the ground that it sought attorney work product material. However, with plaintiffs' consent, the Court Ordered plaintiffs "not [to] conduct destructive testing on the bolt [] without giving reasonable notice to defendants." Id. 13:3-15; Order, Nov. 30, 2017 [Doc. No. 147].

All defendants concede the bolt has broken into two, however, the authenticity of the bolt, and the cause and timing of its fracture, are disputed. Defendants posit that the bolt produced by plaintiffs may not be the bolt in use when plaintiff fell on December 24, 2013. Defendants argue that the cleaning of the bolt on May 10, 2017 spoliated evidence which may be relevant to their analysis of when and how the bolt broke. Uintah moves for the dismissal of plaintiffs' complaint, asserting "the necessary evidence [required] to determine the cause of the bolt fracture has been irrevocably destroyed and the defense experts' ability to complete their analysis has been frustrated." Mot., Br. at 1. More specifically, Uintah alleges that on May 10, 2017 plaintiffs "spoliated crucial evidence by introducing a corrosive cleaning liquid – Branson Cleaner – to the surface of the broken bolt piece." Id. at 3. Unitah asserts that before it was "inspected by the defense experts, [plaintiffs'] counsel and their first expert conducted a secret[ive] destructive testing of the bolt," denying them the opportunity to observe "the fracture surfaces in [their] unaltered condition." Id. at 1. Uintah also alleges "[n]o photographs of the bolt pieces were taken prior to the cleaning," which deprived defendants' experts of the "ability to view the level of oxidization" before its removal. Id. at 2-3. Uintah further contends the "Branson Cleaner did not just remove the oxidation and materials on the fracture surface, but [that] it

9

also obliterated the fracture surface due to its corrosive nature." Id. at 4. Defendants argue plaintiffs intentionally destroyed evidence in an effort to conceal or coverup a potential fraud or planting of evidence. See Oral Arg. Tr. 22:19-23:6, Sept. 21, 2018 [Doc. No. 247].[4]

Plaintiffs oppose Unitah's motion, contending "any pertinent evidence still exists [which] was and is freely available to the defendants." Pls.' Opp. at 3 [Doc. No. 228]. Plaintiffs dispute the claim that no photographs were taken pre-cleaning, alleging that "over 300 photographs were taken by defendants."[5] Id. at 2. Plaintiffs also dispute Uintah's claim that it "only had access to a cleaned fracture surface, as one of the fracture surfaces remained entirely unaltered." Id. at 5. Plaintiffs contend only one-half, not both halves of the bolt, was cleaned on May 10, 2017. In addition, plaintiffs contend it is common practice in labs to clean the surface of a metal in order to actually examine it. See Iezzi Dep. 123:16-18. Plaintiffs point to their expert's belief that applying Branson cleaner did not alter evidence or affect

---

[4] See, e.g., Petzl Supp. at 3 ("Plaintiff[s'] testing destroyed evidence material to determining the cause of the bolt fracture, and evidence regarding where the fracture occurred."); TMI Resp. at 29 ("Plaintiffs have severely impaired the defendants' ability to defend this case and to prove potential fraud.").

[5] Uintah now concedes the existence of photographs but alleges they were only "offered 41 useless photographs" taken by defendant Petzl which "are only macroscopic, and do not include the additional microscopic photographs the defense experts expected." Uintah Reply at 8-9; see also Oral Arg. Tr. 20:12-14.

test results. See id. 123:24-124:8. Plaintiffs further contend they had "no duty to preserve the oxidation on one half of the fracture surface, as its removal presented no foreseeability of harm or prejudice to the defendants." Pls.' Opp. at 6. Accordingly, plaintiffs argue defendants are "unable to identify any prejudice" they suffered. Id. at 5. In sum, plaintiffs contest defendants' characterization of removing rust or oxidation as spoliation, and maintain that no evidence was destroyed. Id. at 6.

DISCUSSION

Defendants seek dismissal of plaintiffs' complaint based on the alleged spoliation of evidence, or alternatively, imposition of a less severe sanction as determined at the Court's discretion. The alleged spoliation took place when the bolt was "cleaned" with Branson cleaner on May 10, 2017. Defendants' argument entails a two-part inquiry. The first question to be addressed is whether actionable spoliation occurred when the bolt was cleaned. If the answer is yes, the Court must decide the appropriate sanction to impose. If the Court determines no spoliation occurred, the Court's analysis is complete and Uintah's motion will be denied.

1.   Third Circuit Common Law Applies Here

Unitah incorrectly cites to state law cases to support its motion. To the contrary, the Third Circuit has repeatedly held that even in diversity cases "possible preclusion of evidence in cases such as this is governed by federal law as part of the

11

inherent power of a district court to sanction parties."[6] Capograsso v. 30 River Ct. E. Urban Renewal Co., 482 Fed. App'x 677, 681-82 (3d Cir. 2012) (quoting Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 78 (3d Cir. 1994)). This power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs." Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (quoting Link v. Wabash R. Co., 370 U.S. 626, 630-631 (1962)). Thus, the Court will proceed to apply federal case law and not state law as originally urged by most of the parties.[7]

    2.   Elements Necessary to Prove Actionable Spoliation

Spoliation of evidence traditionally occurs where evidence is either altered or destroyed. Bull v. United Parcel Serv., Inc., 665 F.3d 68, 73 (3d Cir. 2012). In some cases, even the mere nonproduction or failure to produce evidence has been held to have the same effect as destroying it – by evincing the party's fear "that the contents would harm him." Id. (quoting Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995)). However, only under certain circumstances should the nonproduction of evidence be "rightfully characterized as spoliation." This is

---

[6] See, e.g., Bull v. United Parcel Serv., Inc., 665 F.3d 68 (3d Cir. 2012); Indemnity Ins. Co. of N. Am. v. Electrolux Home Prods., Inc., 520 Fed. App'x 107 (3d Cir. 2013).

[7] At oral argument all the parties conceded federal law does in fact apply here. See Tr. 4:18-20 (Uintah); id. 39:9-16 (TMI); id. 48:7-16 (Brighton, Quality) (adopting arguments of co-defendants); id. 49:2-11 (plaintiffs).

true because the crux of such a determination must ultimately rest on a finding of intent. Id. at 73, 79. The intent which must be shown is that evidence was destroyed in order to prevent it from being used by the adverse party. McCann v. Kennedy University Hosp., C.A. No. 12-1535 (JBS/JS), 2014 WL 282693, at *6 (D.N.J. Jan. 24, 2014); Van Der Wiele v. Acme Supermarkets, C.A. No. 13-5924 (CCC) 2015 WL 4508376, at *2 (D.N.J. July 24, 2015). To be clear, therefore, the mere destruction or loss of evidence in and of itself does not make out a claim for actionable spoliation; more must be shown.[8]

To establish a prima facie case of actionable spoliation four elements must be satisfied: (1) the evidence was in the party's control, (2) the evidence is relevant to the claims and/or defenses in the case, (3) actual suppression or destruction of the evidence has occurred, and (4) the duty to preserve the evidence was reasonably foreseeable to that party. Ortiz v. Adams, No. 2:08-CV-04509 (WHW), 2018 WL 3410027, at *3 (D.N.J. July 13, 2018) (quoting Bull, 655 F.3d at 73). The party seeking sanctions bears the burden of proof as to each element of the prima facie claim. Lexipath Tech. Holdings, Inc. v. Welch, No. 13-CV-5379-PGS-LHG, 2016 WL 4544344 (D.N.J. Aug. 30, 2016), aff'd, No. 17-2604, 2018

---

[8] This motion obviously does not involve analysis of Fed. R. Civ. P. 37(e), which addresses the failure to preserve electronically stored information.

WL 3620479 (3d Cir. July 30, 2018). Further, this is not a balancing test – ergo, every element must be met.

As is the case here, it is commonly not difficult to establish the first, second, and fourth prongs to the prima facie test. The parties do not contest the fact that plaintiffs were in possession and control of the bolt when the May 10, 2017 testing took place. See Pl. Dep. 238:25-239:12; Petzl Supp., Ex. C. Also, given plaintiffs' allegations of design and manufacturing defects, it is clear the bolt is relevant to the claims and defenses in the case. Last, the fact that the bolt is the key evidence in the case, in addition to defendants' requests to preserve evidence, establish that plaintiffs' duty to preserve the bolt was objectively reasonable. See id.; Petzl Supp., Exs. A-B; TMI Resp., Ex. V; Order, Nov. 30, 2017.

> 3.    Defendants Must Show Plaintiffs Spoliated Evidenced in Bad Faith in Order for Spoliation Sanctions to be Imposed

In order for spoliation to be actionable the moving party must demonstrate "actual suppression or withholding of the evidence," which requires a showing of intent apart from establishing the alleged conduct as a matter of fact. Bull, 665 F.3d at 79 (quoting Brewer, 72 F.3d at 334). In Bull, the Third Circuit stressed that "a finding of bad faith is pivotal to a spoliation determination." Id. Moreover, bad faith "requires more than ordinary negligence." Lucia v. McClain & Co., Inc., No. 11-

14

930 (CCC/JAD), 2013 WL 4517976, at *16 (D.N.J. Aug. 23, 2013). The fact that a finding of bad faith is essential to making out a claim for actionable spoliation has been emphasized in a long line of cases.[9] See, e.g., Bull, 665 F.3d 68; Victor v. Lawler, 520 F. App'x 103, 105-06 (3d Cir. 2013); Peterson v. Attorney Gen. Pa., 551 F. App'x 626, 628 (3d Cir. 2014) (holding "plaintiff did not show bad faith necessary to support sanctions for spoliation" despite also finding that defendant failed to produce documents); Orologio of Short Hills Inc. v. Swatch Grp. (U.S.), 653 F. App'x 134, 145 (3d Cir. 2016) (denying spoliation motion despite finding that the evidence was destroyed); Alston v. Park Pleasant, Inc., 679 F. App'x 169, 173 (3d Cir. 2017) (denying sanctions even though finding the defendant failed to preserve the requested evidence); Ortiz, 2018 WL 3410027, at *3-4 (holding plaintiff failed to allege actionable spoliation despite also finding defendants failed to produce the requested evidence). Consequently, for the Court to find that actionable spoliation occurred in this case, defendants

---

[9] The element of bad faith is a key distinction between federal common law and state common law. Pursuant to New Jersey law, a showing of bad faith is not required to make out a claim of actionable spoliation. "[T]he spoliator's level of intent, whether negligent or intentional, does not affect the spoliator's liability. Rather, it is a factor to be considered when determining the appropriate remedy for the spoliation." Aetna Life & Cas. Co. v. Imet Mason Contractors, 309 N.J. Super. 358, 368 (App. Div. 1998)(quoting Hirsch v. General Motors Corp., 266 N.J. Super. 222, 256 (Law Div. Essex Cty., May 4, 1993)); Manorcare Health Services, Inc. v. Osmose Wood Preserving, Inc., 336 N.J. Super. 218, 226 (App. Div. 2001)).

must show plaintiffs acted in bad faith. See, e.g., Peterson, 551 F. App'x at 628; Victor, 520 F. App'x at 105-06 (affirming the Magistrate Judge's ruling because movant "failed to demonstrate culpable spoliation"); Orologio, 653 F. App'x at 145 (stating spoliation "requires 'bad faith,' not mere negligence," which the movant failed to demonstrate). In order for Uintah's motion to be granted, therefore, it is not enough for defendants to show plaintiffs lost or destroyed evidence. Defendants must show this was done in bad faith, which requires a showing that there was an intent to withhold evidence. Bull, 665 F.3d at 79.

The fact that the mere loss of evidence is not enough in and of itself to make out a claim for actionable spoliation in the Third Circuit is demonstrated in numerous cases. See discussion, supra. For example, in Orologio, supra, a case involving a business dispute between the defendant-watchmaker and plaintiff-retailer, the plaintiff moved for sanctions upon learning that the defendant authorized the destruction of television commercials during the pendency of the litigation which were relevant to the plaintiff's case. However, the record indicated the defendant destroyed the tapes without reference to the litigation and for the sole reason of no longer wanting to pay a storage company to store the tapes. Id. at 138. Nevertheless, the plaintiff still contended that the defendants spoliated evidence because they were put on notice to preserve it years earlier in an email sent by the plaintiff. Id.

16

In applying the prima facie test for spoliation of evidence, the Court "discerned no allegation by [the plaintiff] of a nefarious plot to destroy evidence," despite the defendant being on notice of its duty to preserve the tapes. Id. at 145. As such, it was found that the plaintiff "failed to show bad faith" on the defendant's part. Id. On appeal, the Third Circuit concluded email exchanges in the record referencing the destruction of the tapes "amply support[ed]" the determination the defendant did not act in bad faith by authorizing the destruction of its commercials. Id.

### 4.    Plaintiffs Did Not Act in Bad Faith

Similar to Orologio, this Court finds that defendants have not satisfied their burden of proving plaintiffs acted in bad faith when they authorized their expert to apply Branson cleaner to the bolt on May 10, 2017. Quite simply, there is no evidence plaintiffs intended to withhold relevant evidence from defendants. Instead, the record shows that plaintiffs' alleged spoliation "was a matter of routine with no fraudulent intent." McCann, 2014 WL 282693, at *6 n.5 (quoting Bull, 665 F.3d at 79). This is evidenced by the fact that Dr. Iezzi testified it is "common practice" to clean a fracture surface prior to SEM imaging.[10] Dr. Iezzi also testified

---

[10] Dr. Iezzi testified as follows: "It is common practice in the SEM microscopy laboratories to clean the surface in some way to show the true fracture surface." Iezzi Dep. 123:16-18. Dr. Iezzi did not question Micron's expertise and procedure: "So Micron's been doing this a long time. I did not question their routine

he did not consider the use of Branson cleaner to be "destructive testing," but understood it as more of a precautionary measure that was taken to prevent "introducing oil or contaminants" to the SEM equipment. Iezzi Dep. 65:2-66:11, 123:2-124:8. In addition, Dr. Iezzi testified that any oxide on the bolt had to be removed because of "charging." Id. 123:10-13 ("The electrons would build up on the surface and give you like a glow, almost like putting metal into the microwave."). Moreover, Dr. Iezzi indicated that everyone involved in the testing was "being very careful, per instruction from" plaintiffs' counsel who retained possession and control of the bolt. Id. 56:12-22. Dr. Iezzi's testimony makes it evident that plaintiffs' counsel did not act in bad faith by authorizing the bolt's cleaning. Acting on the recommendation of Micron and with Dr. Iezzi's consent, the Court discerns no "nefarious plot to destroy evidence." Orologio, 653 F.3d at 145. Nor does the Court discern any fraud or desire to suppress the truth. Bull, 665 F.3d at 79 (citing 29 Am. Jur. 2d Evidence, §177) ("Such a presumption arises . . . only when the spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.").

---

procedure to take a look and see or to remove what they apparently removed." Id. 123:19-22.

Defendants repeatedly argue plaintiffs' bad faith is evidenced by the fact they cleaned the bolt on May 10, 2017, after they were on notice defendants requested the bolt be preserved. What the defendants are missing, however, is the fact that plaintiffs did not intend to spoliate, destroy, or hide any evidence. Plaintiffs' expert and attorneys did not and do not believe that applying Branson cleaner to the bolt had any material effect on the bolt. In fact, plaintiffs' expert testified it was routine to clean the bolt before SEM testing. Even assuming for the sake of argument that defendants are right and plaintiffs are wrong, that the cleaning on May 10, 2017 did remove relevant oxidation (rust) and possible debris, defendants still do not satisfy their burden to show plaintiffs acted in bad faith. Under Third Circuit precedent, plaintiffs' negligence or inadvertence does not support a spoliation claim. At bottom, there is no evidence plaintiffs intended or believed cleaning the bolt would have any material effect on the bolt or the underlying merits of plaintiffs' case, or that cleaning the bolt would give them any advantage in the litigation.[11]

Defendants focus on the fact that plaintiffs intentionally cleaned the oxidation or rust on the bolt on May 10, 2017. Again, while this is no doubt true, defendants cannot show the cleaning

---

[11] Unitah concedes the cleaning did not change the physical structure of the bolt. See Oral Arg. Tr. 9:13-25.

was done in bad faith. There is no evidence, for example, plaintiffs knew or believed the manner or extent of oxidation on the bolt would hurt their case, prompting them to clean the bolt. Nor does evidence exist that plaintiffs knew or believed they would gain an advantage in the case by cleaning the bolt. In fact, the opposite is true. Otherwise, plaintiffs would not have permitted Petzl to inspect and take extensive photographs of the bolt on March 21, 2017, before the bolt was cleaned. Nor would plaintiffs have authorized only one-half of the bolt to be cleaned rather than both halves.[12]

In order to find plaintiffs acted in bad faith, the Court must find that plaintiffs "intended to impair the ability of [defendants] to defend [themselves]." <u>Schmid v. Milwaukee Elec. Tool Corp.</u>, 13 F.3d 76, 80 (3d Cir. 1994). The "fundamental element of bad faith spoliation is advantage-seeking behavior by the party with superior access to information necessary for the proper administration of justice." <u>Micron Tech., Inc. v. Rambus, Inc.</u>,

---

[12] The same Micron May 11, 2017 expert report defendants rely upon to argue the bolt's fracture surfaces were "extremely oxidized," indicates only one-half of the bolt was cleaned with Branson cleaner. <u>See</u> Mot., Ex. B. ("The fracture face still attached to the bolt was cleaned with Branson cleaner (1:10 ratio, cleaner to DI water) to remove the oxide prior to SEM imaging."). Although Unitah relies on Dr. Iezzi's testimony that he "suspects" both halves were cleaned (<u>see</u> Uintah Reply at 4-5), the fact is that Dr. Iezzi was not present when the bolt was cleaned and he has no relevant firsthand knowledge of what was cleaned. <u>See</u> Iezzi Dep. 122:6-123:1, 141:13-16.

645 F.3d 1311, 1326-27 (Fed. Cir. 2011). Therefore, in order to find plaintiffs acted in bad faith, the Court must find that plaintiffs authorized the bolt to be cleaned on May 10, 2017 to disadvantage defendants. Micron Tech., Inc. v. Rambus Inc., 917 F. Supp. 2d 300, 315 (D. Del. 2013). This evidence is lacking.

The Court rejects the notion defendants posit that plaintiffs were barred from testing the bolt after they received Petzl's letters requesting that evidence be preserved. And, that if plaintiffs wanted to examine the bolt they had to give defendants notice. Defendants' letters did not estop plaintiffs from preparing their case so long as plaintiffs did not spoliate evidence. The fact that plaintiffs tested the bolt via an SEM on May 10, 2017 is classic work-product. Unless it was required to be disclosed in their expert disclosures, which turned out to be the case when plaintiffs' expert reports were produced, plaintiffs had no duty to reveal to defendants the fact that they examined the bolt on May 10, 2017. The fact that plaintiffs did not disclose their work-product is not equivalent to withholding evidence as defendants argue.

The Court is skeptical of defendants' argument that the oxidation on the bolt on May 10, 2017 is as important as they claim.[13] After all, plaintiffs admit the bolt was outside in the

---

[13] Unitah argues the oxidation may answer the question when the bolt broke, where the bolt pieces were when they were missing for

elements from December 24, 2013 to March 2014. Thereafter, the bolt was in a kitchen drawer for the next one and a half years. Under these conditions plaintiffs are hard pressed to argue that, if the bolt was not cleaned on May 10, 2017, they would have been able to test it in the same condition it was in on December 24, 2013. This is especially true considering the fact that metals oxidize from exposure to air instantaneously, including steel. Iezzi Dep. 123:6-7. Also, the longer a bolt is exposed to moisture and air, the more oxidation is expected. Id. 75:9-12. The fact of the matter is the testing plaintiffs are relying upon was done after May 10, 2017. For purposes of trial, therefore, defendants' experts tested the bolt in the same exact condition as did plaintiffs. Moreover, defendants' claims of prejudice are overstated in view of the fact their experts prepared extensive reports, "to a reasonable degree of scientific or engineering certainty," in support of defendants' liability positions. If defendants were as irreparably harmed as they claim, for example, Brighton Best (35 pages), Petzl (21 pages), and Uintah (35 pages), likely would not have been able to produce metallurgical expert reports opining that the bolt was not defectively designed and

---

3-4 months, and whether the bolt broke on the roof or sometime thereafter. See Oral Arg. Tr. 12:18-13:10.

manufactured, and that potential misuse or an unforeseeable overload caused the bolt to break.[14]

At oral argument Unitah pointed to three events on May 10, 2017 which supposedly demonstrate plaintiffs' bad faith: (1) plaintiffs' counsel and not the expert controlled the bolt, (2) no defendants were present at the test, and (3) no pictures were taken. See Oral Arg. Tr. 10:21-11:14. None of this shows bad faith. Rather than showing bad faith, the fact that plaintiffs' counsel controlled the bolt shows plaintiffs were being careful about not spoliating the bolt. In addition, as noted, defendants had no right to be present during plaintiffs' testing and the bolt was previously photographed by Petzl. No evidence has been presented that plaintiffs had a nefarious intent when they failed to take pictures on May 10, 2017.[15] Defendants also rely on the fact plaintiffs used a 10 percent solution to clean the bolt rather than a 6-7 percent solution. However, there is no evidence this unduly affected the bolt. Most importantly, even if the technical cleaning instructions were not faithfully followed, there is no evidence this was done in bad faith.

---

[14] To be clear, if supported by competent evidence, nothing in this Report and Recommendation bars defendants from arguing that because the bolt was in the elements and plaintiffs' drawer from December 24, 2013 to December 2015, the bolt was not in the same condition when it was tested as it was when the accident happened.
[15] Plaintiffs' counsel explained that the reason they did not take pictures was because Petzl had already taken ample pictures. See Oral Arg. Tr. 21:17-22.

As discussed, the Court finds that defendants have failed to show bad faith on the part of plaintiffs or their counsel, and defendants have not satisfied their burden of showing plaintiffs sought to intentionally deprive defendants of access to relevant evidence. The law is clear in the Third Circuit that there is no claim for negligent spoliation. While it may be true that upon reflection plaintiffs may have done things differently, they did not act in bad faith when they authorized the cleaning of the bolt on May 10, 2017. Therefore, the Court cannot find that plaintiffs' conduct constitutes actionable spoliation.

Petzl's reliance on <u>Micron Tech., Inc.</u>, 917 F. Supp. 2d 300, to argue it does not have to show bad faith to make out an actionable claim of spoliation is misplaced.[16] In that case the Court held the patents-in-suit were unenforceable against the alleged infringer because of the patentee's spoliation of documents. This holding was issued only after the Court found clear and convincing evidence that the patentee's spoliation was carried out in bad faith. <u>Id.</u> at 319. In fact, the Court set forth a lengthy summary of the patentee's intentional and deliberate scheme to destroy relevant documents in order to obtain a litigation advantage. <u>Id.</u> at 305-14. It is true as Petzl argued

---

[16] The cited case was issued after the case was remanded from the Federal Circuit. It is unclear whether the Federal Circuit applied general federal common law or Third Circuit precedent.

that the Micron decision discussed the patentee's degree of fault. Id. at 324. However, the discussion was in the context of what sanctions should be imposed and whether dismissal was appropriate. The Court never wavered from the fact that the moving party had the burden to prove bad faith spoliation. Here, a sanction analysis is not necessary because Unitah cannot show that evidence was destroyed in bad faith.

Defendants ask the Court to infer plaintiffs' bad faith conduct from the totality of their "litigation tactics." TMI Resp. at 4; see Oral Arg. Tr. 37:14-38:5. Only TMI briefed the issue, but the other defendants joined in at oral argument. See Oral Arg. Tr. 37:14-38:19 (Uintah); id. 43:19-45:11 (Petzl); id. 48:7-11 (Brighton-Best); id. 48:15-16 (Quality Plating). Specifically, Uintah asks the Court to infer bad faith from "an entire pattern and practice from day one, that [plaintiffs] were going to do what they wanted with this bolt, [and] they didn't care what [defendants] got to do with the bolt." Oral Arg. Tr. 37:14-18. Defendants' perceive plaintiffs' bad faith as not just the "act of spoliation," but "then [] hid it from everybody . . . [n]ot just the defendants." Id. 11:23-24.

Although the Court "has discretion to draw inferences from the record on a party's intent, it strays beyond the bounds of its discretion when . . . there is no factual basis to do so." Bull, 665 F.3d at 74. Although in hindsight it would have been better

had plaintiffs disclosed earlier on that the bolt was cleaned on May 10, 2017, contrary to defendants' arguments,[17] plaintiffs' nondisclosure does not establish bad faith. Instead, the record indicates that any reluctance by plaintiffs' counsel to share details regarding the testing was motivated by their belief that the information constituted "classic work product . . . protected under privilege." See Tr. 9:21-10:19, Nov. 29, 2017. Likewise, plaintiffs never objected to giving defendants reasonable notice of any planned destructive testing. Plaintiffs also agreed not to conduct destructive testing. See id. 5:9-13. Even if plaintiffs were wrong about the fact that relevant evidence may have been lost on May 10, 2017, a fact the Court is not deciding, at most the loss was due to plaintiffs' inadvertence or negligence, not bad faith. Defendants have failed to satisfy their burden of proving plaintiffs acted in bad faith. Given that defendants have made no such showing, defendants have not made out a claim for actionable spoliation.

---

[17] See TMI Resp. at 4 ("Simply conducting the testing during discovery and without notice to the defense would constitute bad faith."); id. ("[T]he bad faith litigation tactics underscore the need to dismiss this case outright."); id. at 21 ("The cover-up that followed demonstrates classic bad faith."); id. at 28 ("The willfulness, bad faith and simple cover-up orchestrated by Plaintiffs through their counsel warrant the most severe sanction.").

In sum, the Court does not find plaintiffs acted in bad faith in view of the following: (1) plaintiffs knew and acknowledged they would not conduct destructive testing without notice to plaintiffs, (2) plaintiffs told their expert/consultant not to do destructive testing, (3) plaintiffs and their expert/consultant did not and do not believe cleaning the bolt was destructive testing,[18] (4) the bolt was cleaned by a testing laboratory whose credentials are not questioned, (5) it appears the testing laboratory suggested the bolt be cleaned and not plaintiffs, (6) only one-half of the bolt was cleaned, (7) Petzl examined and photographed the bolt before it was cleaned, (8) plaintiffs' expert/consultant believed it was common practice to clean the bolt before testing it,[19] and (9) Dr. Iezzi testified that SEM testing could not be done unless the bolt was cleaned.

The Court finds that the following arguments made by defendants do not satisfy their burden to show plaintiffs intended to deprive them of evidence or gain an advantage in the litigation: (1) plaintiffs did not reveal their work-product to defendants, (2) plaintiffs did not separately photograph the bolt during the

---

[18] Dr. Iezzi testified, "[t]he advantage of the scanning electron microscope and of the optical microscope is that you do not have to alter the sample in any way." Iezzi Dep. 57:14-20. He also testified, "we were being very careful," per plaintiffs' counsel's instruction, "not to do any destructive testing, not to alter the bolt in any way, shape or form." Id. 57:21-24; 60:14-18.
[19] Iezzi Dep. 123:16-23.

May 10, 2017 testing at Micron, (3) the cleaning instructions for the bolt were not faithfully followed, and (4) the May 10, 2017 examination was done without defendants notice or presence.

<u>Conclusion and Recommendation</u>

Accordingly, for all the foregoing reasons, on this 16th day of November 2018, it is respectfully recommended that Unitah's Motion to Dismiss Plaintiff[s]' Complaint Based on Spoliation of Evidence be DENIED. The parties shall have fourteen (14) days after being served with a copy of this Report and Recommendation to serve and file any objections with the Clerk of the Court, pursuant to Fed. R. Civ. P. 72(b) and L. Civ. R. 72.1(a)(2).


<u>/s/ Joel Schneider</u>
JOEL SCHNEIDER
United States Magistrate Judge