THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| Nicholas Kuhar et al., <br><br> Plaintiffs, <br><br> v. <br><br> Petzl Co. et al., <br><br> Defendants. | Civil No. 16-395 (RMB/JS) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the "Motion to Strike Defendant Uintah's Experts" [Doc. No. 271] ("motion") filed by plaintiffs. The Court received the opposition of defendant Uintah Fastener & Supply, LLC ("Uintah") [Doc. No. 290], plaintiffs' reply [Doc. No. 291], and the Court recently held a Daubert hearing.[1] For the reasons to be discussed, plaintiffs' motion is GRANTED in part and DENIED in part.

**Background**

Since the parties are familiar with the case, the Court incorporates by reference its summary of the fact background and procedural history of the case set forth in Kuhar v. Petzl Co., C.A. No. 16-0395 (JBS/JS), 2018 WL 7571319, at *1 (D.N.J. Nov. 27,

---

[1] At the hearing, Uintah produced live testimony from two of its three experts that plaintiffs' motion seeks to strike, Dr. David P. Pope and Daniel M. Honig, P.E. See Doc. No. 298.

1

2018).[2] By way of brief background, the present action is a products liability case arising from plaintiff Nicholas Kuhar's use of a safety harness called a "micrograb" while working on the roof of a barn. Kuhar was allegedly using the micrograb harness when a component steel bolt broke in two, causing him to fall thirty-seven (37) feet and sustain serious injuries. Plaintiffs' claim is primarily focused on design and manufacturing defects associated with the broken bolt. Uintah is alleged to have supplied a component part of the micrograb or the broken bolt at some point in the supply chain. See id. at *1.

On or about March 28, 2018, defendant Uintah produced two expert reports: a report co-authored by its metallurgist experts, Drs. David P. Pope and Mark W. Licurse ("Pope/Licurse"); and a report by its engineering expert, Daniel M. Honig, P.E. ("Honig"). See Pls.' Br. at 2 [Doc. No. 271-1]; see also Pope/Licurse Report [Doc. No. 271-2]; Honig Report [Doc. No. 271-4].[3]

Drs. Pope and Licurse are metallurgists holding degrees in engineering and Ph.D.'s in material sciences. See Doc. No. 271-3. In their report, Drs. Pope and Licurse opined the following to a reasonable degree of engineering certainty:

---

[2] In this Memorandum Opinion and Order the Court addressed whether to exclude plaintiffs' liability expert, Dr. Richard F. Lynch, under Daubert. The Court Ordered the expert be stricken. Plaintiffs' appeal [Doc. No. 265] of the Order was recently denied by the Honorable Renée Marie Bumb. See Doc. No. 322.
[3] Plaintiffs do not object to the experts' qualifications.

2

(1) The bolt fractured in an area which is unstressed during normal use of the Micrograb;

(2) This area remains unstressed even when a 4mm gap exists between the shoulder face and nut;

(3) The fracture is entirely ductile – by microvoid coalescence over the entire fracture surface;

(4) Failure by microvoid coalescence is to be expected if this bolt, in its properly heat treated condition, is subjected to a gross overload;

(5) The bolt was somehow grossly overloaded in the region of the fracture, even though the fracture region is not stressed during normal use;

(6) No evidence of fatigue damage was found anywhere on the fracture surface;

(7) Therefore, the bolt did not fracture during normal use of the Micrograb;

(8) A load of at least 1,000 lbs. was somehow applied to the nut end of the bolt, and this very large load grossly bent and broke the bolt;

(9) The application of such a load to this location on the bolt is totally outside the realm of normal use of the device.

Pope/Licurse Report at 16.

Honig has a Bachelor of Science degree in civil engineering and specializes in structural engineering. See Doc. No. 271-5. In his report, Honig opines within a reasonable degree of engineering certainty that:

(1) Mr. Kuhar's familiarity during his eight to nine year usage history with this Micrograb device indicates that he had a general working knowledge of its use and operation.

According to Mr. Kuhar's deposition testimony, he had briefly read the Micrograb instructions, which state the need for proactive and periodic inspection during the course of the use of the Micrograb device.

On the date of the fall incident, Mr. Kuhar was not using the Micrograb as it was designed and intended to be operated;

(2) At the time of this fall incident, there was no evidence of multiple and redundant safety lines present within the jobsite work area.

In addition, there is no witness corroboration of the presence of redundant safety lines other than the single line that Mr. Kuhar testified he was using at the time of his fall;

(3) Mr. Lynch has not provided any reasonable expert engineering explanation for the presence of the 3/16" wide gap dimension between the outside face of the Micrograb and the lock nut, which was threaded onto the axle bolt end area.

Given this connection design detail, the reason for providing a steel and nylon-insert lock nut on the axle bolt is to maintain the lock nut in a fixed position, which must be manually adjusted by an external rotational force, such as that provided by an Allen wrench or similar mechanical tool;

(4) Based on my structural engineering experience with equipment that incorporates dissimilar materials, such as this Micrograb device, the order of magnitude of external forces required to fracture a high strength steel bolt far exceeds the expected normal use conditions for this type of device. Even the significant gravity forces generated by a personnel fall incident would not be sufficient to cause this bolt connection to fail.

In fact, if the threaded end of this type of bolt were to become so severely overloaded so as to cause bolt end fracture in the manner documented by

> Micron,[4] there would be related and obvious collateral damage to the Micrograb body. Note that this outcome assumes that the axle bolt has remained within the Micrograb device.
>
> Expected collateral and adjacent metallurgical damage from such a severe bolt overload event would be clearly evident within the softer and larger cast aluminum body portion of the Micrograb device, however, no such damage was documented by Micron.

Id. at 6-7.

Plaintiffs move to strike Uintah's experts and their reports in their entirety contending they fail to satisfy the requirements of Fed. R. Civ. P. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Plaintiffs generally allege the Pope/Licurse Report is unreliable and does not fit the issues in the case. Specifically, plaintiffs object to Drs. Pope and Licurse's use of undefined terms and allege they impermissibly opine as to the "normal use" of the micrograb. See Pls.' Br. at 4. As to the Honig Report, plaintiffs generally allege his opinions lack any reliable scientific foundation and are otherwise improper subjects for expert testimony. Id. at 6-9.

---

[4] Micron is a laboratory in which all parties consented to a joint inspection of the bolt, which took place on November 13, 2017. See Kuhar v. Petzl Co., C.A. No. 16-0395, 2018 WL 6363747, at *3 (D.N.J. Nov. 16, 2018). This Report and Recommendation addressed whether plaintiffs' complaint should be dismissed for spoliation of evidence. The Court found no spoliation occurred and recommended against dismissal. The Recommendation was affirmed. See Doc. No. 268.

5

Uintah opposes plaintiffs' motion contending it is "premised on faulty reasoning, a misapplication of the law and a failure to consider the entire report of [its] experts, instead, focusing on single sentences or statements taken out of context." Opp. at 1 [Doc. No. 290]. Uintah alleges its experts' opinions are based upon scientifically valid reasoning and methodology, and that they "have properly applied [their] reasoning and methodology to the facts at issue in this case." Id. Therefore, Uintah argues the reports and opinions of each of its experts satisfies the Daubert standard of admissibility. Id.

**Discussion**

The Court incorporates by reference its discussion of the applicable law regarding the Daubert standard and Rule 702 set forth in Kuhar, 2018 WL 7571319, at *2-3.

A. Pope/Licurse Report

The Court finds the Pope/Licurse Report and the opinions contained therein, in large part, satisfy Daubert's admissibility requirements. Prior to addressing each opinion in turn, the Court will discuss plaintiffs' objection to the following passage found in the body of the Report:

> It is important to note that it is extremely unlikely that the two pieces of the bolt landed within inches of each other after the fracture. This is true for multiple reasons, including the fact that the two bolt pieces have very different and irregular shapes so their paths down and off the roof are expected to deviate

6

substantially from each other. Furthermore, when a strong bolt fractures, the pieces fly apart.

Pope/Licurse Report at 3.

The Court finds the opinion as set forth above to be a fact question left for the jury to decide. The jury will decide, not Drs. Pope or Licurse, whether plaintiffs' account is credible as to when, where, and how the two bolt pieces were recovered. To aid the jury in making factual determinations, expert opinion testimony "must be predicated upon evidence, not speculation." <u>Worrell v. Elliot</u>, 799 F. Supp. 2d 343, 349 (D.N.J. 2011). At the <u>Daubert</u> hearing, Dr. Pope testified that he could not calculate where the bolt pieces would have landed. <u>See</u> Tr., Aug. 19, 2019 at 8:21-9:1. Thus, while Drs. Pope and Licurse may testify as to their expertise in metallurgy and what occurs when a steel bolt breaks (<u>e.g.</u>, the forces exerted and direction of motion), they may not opine or speculate as to the likelihood of where the bolt pieces landed. Counsel can of course make arguments to the jury based on the reasonable inferences to be drawn from their experts' testimony about the mode, speed, and direction of a metal failure.

The Court will now address each of Drs. Pope and Licurse's Report's nine opinions in sequence.

1. <u>Opinion No. 1</u>

Drs. Pope and Licurse's first opinion states as follows:

The bolt fractured in an area which is unstressed during normal use of the Micrograb.

7

Pope/Licurse Report at 16.

The Court finds that Drs. Pope and Licurse's first opinion satisfies the requirements of Rule 702 and Daubert. This is so because the opinion is based upon reliable scientific principles and methods and "reliably flow[s] from the facts known to the expert[s] and the methodolog[ies] used." Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000) (quotation and citation omitted). Dr. Pope testified at the Daubert hearing that under normal use, the section where the bolt fractured would not receive "any load or force." See Tr., Aug. 19, 2019 at 14:7-15:12. Dr. Pope further testified that "normal use" does not refer to the normal use of arborist supplies or "a specialized piece of climbing equipment," as plaintiffs contend. Pls.' Reply at 1 [Doc. No. 291]. Rather, "normal use" refers to what is known to mechanically occur under such circumstances by an expert in his field. See Tr., Aug. 19, 2019 at 15:13-22, 25:25-26:13. Thus, Drs. Pope and Licurse are qualified to render their opinion in this respect, and as such, the opinion fits the issues in dispute. See Daubert, 509 U.S. at 591; see also Oddi, 234 F.3d at 145 (noting "that an expert's 'qualifications' are interpreted liberally"). As such, the Court finds that the first opinion satisfies the Daubert standard.

    2. Opinion No. 2

Drs. Pope and Licurse's second opinion states as follows:

8

> This area remains unstressed even when a 4mm gap exists between the shoulder face and nut.

Pope/Licurse Report at 16.

The Court finds the second opinion satisfies the <u>Daubert</u> standard for the reasons discussed above. Drs. Pope and Licurse base their second opinion upon reliable scientific principles and methodologies, and it reliably flows from the facts known to them and the methods they employed. Namely, Dr. Pope testified that the micrograb "had been assembled with the nut not fully tightened on the bolt," allowing it to move "by a quarter of a millimeter." Tr., Aug. 19, 2019 at 21:1-3. Yet, with the aid of several figures, photographs, and his knowledge of the subject, Dr. Pope contended the same conditions would exist even if the bolt had been tightly fastened, in that it would bear no stress at the fracture location. <u>Id.</u> at 21:3-20. Thus, the Court finds that the second opinion is both reliable and fit for the issues in dispute.

### 3. <u>Opinion No. 3</u>

Drs. Pope and Licurse's third opinion states as follows:

> The fracture is entirely ductile – by microvoid coalescence over the entire fracture surface.

Pope/Licurse Report at 16.

The Court finds the third opinion is sufficiently reliable and fit for the reasons previously discussed. Dr. Pope testified that this opinion is the product of extensive laboratory testing, which entailed various scientific methods, including observations

9

of the bolt under a scanning electron microscope (or "SEM"). See Tr., Aug. 19, 2019 at 17:20-18:19. Based upon these observations, Dr. Pope testified he was able to examine the "structure of the [bolt's] failure," which he contends "is the basis for almost any analytical approach to fracture" analysis. Id. at 17:20-18:12.

Plaintiffs argue Dr. Pope and Licurse's report should be stricken because various terms contained in it are not defined, such as those cited above. However, an expert need not define every term used in their report because to do so would be impractical and inefficient. Dr. Pope testified that "ductile" is best defined as the opposite of the more commonly known term "brittle." See Tr., Aug. 19, 2019 at 11:14-22. Unlike brittle material (e.g., glass), which breaks without deformation, ductile material deforms irreversibly by "shearing action." See id. at 12:2-6. In order to assess how the bolt broke, Drs. Pope and Licurse employed various modes of testing and observation, and contend the results they reviewed demonstrate that the fracture site has a "microvoid coalescence" surface, which Dr. Pope alleges is indicative of a ductile fracture. Id. at 12:10-18, 17:20-18:12. Therefore, for the reasons stated, the Court finds Drs. Pope and Licurse's third opinion satisfies the Daubert standard.

As noted, plaintiffs object because certain terms of art are not defined in Uintah's experts' report. For example, plaintiffs specifically object to Drs. Pope and Licurse's failure to define

10

terms such as "ductile." But an expert is not required to define every technical term contained in his or her report. See Crowley v. Chait, 322 F. Supp. 2d 530, 540 (D.N.J. 2004) ("[O]ne of the very purposes of a Daubert hearing . . . is to give experts a chance to explain and even correct errors that they made in their reports."). Dr. Pope testified at the Daubert hearing that the terms plaintiffs object to are generally accepted as Dr. Pope defined them within his field of expertise. See Tr., Aug. 19, 2019 at 11:3-12:1. Accordingly, the Court finds plaintiffs' objection is without merit.

    4. Opinion No. 4

Drs. Pope and Licurse's fourth opinion states as follows:

> Failure by microvoid coalescence is to be expected if this bolt, in its properly heat treated condition, is subjected to a gross overload.

Pope/Licurse Report at 16.

The Court finds Drs. Pope and Licurse's fourth opinion satisfies the Daubert standard because it is a product of reliable scientific methods and principles that reasonably flow from the facts known to them. Dr. Pope testified the calculations underlying opinion four are the product of the extensive laboratory testing. See Tr., Aug. 19, 2019 at 16:22-17:19, 32:11-13. The results of the tests were subsequently applied to mathematical equations and formulas that Dr. Pope referred to as "very standard" in his field of expertise. Id. at 17:14-19. As a result, Dr. Pope calculated

11

the subject bolt, in its heat-treated condition, could withstand up to 1,000 pounds of pressure. See Tr., Aug. 19, 2019 at 20:5-7, 19:7-12. Based upon this calculation, and his visual observations of the fracture site under the SEM, Dr. Pope contended a "gross overload" is any force exceeding the 1,000 pound limit. Id. at 17:20-18:19, 22:1-14. Thus, the Court finds the opinion is reliable and fit for the case.

     5. Opinion No. 5

Drs. Pope and Licurse's fifth opinion states as follows:

> The bolt was somehow grossly overloaded in the region of the fracture, even though the fracture region is not stressed during normal use.

Pope/Licurse Report at 16.

This opinion is a culmination of the foregoing conclusions by Drs. Pope and Licurse which the Court finds to be based upon reliable scientific principles and methodologies that reasonably flow from the facts known. See, supra. Specifically, in Opinion four above, the Court found that Dr. Pope applied the known facts and results generated by various modes of scientific testing to a mathematical formula. This led him to conclude the bolt was subjected to at least 1,000 pounds of pressure, which Dr. Pope referred to as a "gross overload." See Tr., Aug. 19, 2019 at 20:5-7; 22:12-19. Accordingly, the Court finds Drs. Pope and Licurse's fifth opinion satisfies the Daubert standard.

### 6. Opinion No. 6

Drs. Pope and Licurse's sixth opinion states as follows:

> No evidence of fatigue damage was found anywhere on the fracture surface.

Id.

The Court finds the sixth opinion satisfies the Daubert standard for reasons already discussed. Dr. Pope testified the observations and photographs taken under the SEM showed no sign of "fatigue striations," which Dr. Pope contended would be present in the case of fatigue damage or overload. See Tr., Aug. 19, 2019 at 22:20-23:17. Therefore, the Court finds that the opinion is reliable and fit for the case.

### 7. Opinion No. 7

Drs. Pope and Licurse's seventh opinion states as follows:

> Therefore, the bolt did not fracture during normal use of the Micrograb.

Pope/Licurse Report at 16.

The Court finds the seventh opinion satisfies the Daubert standard since, similar to the fifth opinion, it is the culmination of opinions reached by Drs. Pope and Licurse in the course of their extensive examinations of the bolt. As the Court discussed, supra, Dr. Pope testified "normal use" refers to the mechanical operation of the subject bolt as a component of the larger device, and not the proper use of climbing equipment. See Tr., Aug. 19, 2019 at 23:20-24:6, 25:25-26:13. Therefore, the Court finds the seventh

13

opinion satisfies Daubert because it is reliable and fit for the case for reasons already discussed at length.

      8. Opinion No. 8

Drs. Pope and Licurse's eighth opinion states as follows:

> A load of at least 1,000 lbs. was somehow applied to the nut end of the bolt, and this very large load grossly bent and broke the bolt.

Pope/Licurse Report at 16.

The Court finds the eighth opinion satisfies Daubert for reasons already discussed, supra. Specifically, this opinion forms the foundation of opinions four and five and merely restates what the Court has already found to be reliable. See Tr., Aug. 19, 2019 at 19:7-12 (calculation); 18:13-19 (gross overload). Accordingly, the Court finds opinion eight satisfies Daubert and Rule 702.

      9. Opinion No. 9

Drs. Pope and Licurse's ninth opinion states as follows:

> The application of such a load to this location on the bolt is totally outside the realm of normal use of the device.

Pope/Licurse Report at 16.

The Court finds that Drs. Pope and Licurse's final opinion is a conclusion based upon opinions the Court has already found to be reliable and fit for the case. As previously addressed, Dr. Pope testified at various points throughout the Court's Daubert hearing that "normal use" refers to what is known to mechanically occur under the circumstances by an expert in his field. See Tr., Aug.

19, 2019 at 15:13-22, 25:25-26:13. Therefore, the Court finds the ninth opinion satisfies the Daubert standard of admissibility and denies plaintiffs' motion to strike Drs. Pope and Licurse's report and testimony in its entirety.

### B. Honig Report

The Court will now address each of Honig's opinions from his report in sequence.

#### 1. Opinion No. 1

Honig's first opinion states as follows:

> Mr. Kuhar's familiarity during his eight to nine year usage history with this Micrograb device indicates that he had a general working knowledge of its use and operation.
>
> According to Mr. Kuhar's deposition testimony, he had briefly read the Micrograb instructions, which state the need for proactive and periodic inspection during the course of use of the Micrograb device.
>
> On the date of the fall incident, Mr. Kuhar was not using the Micrograb as it was designed and intended to be operated.

Honig Report at 6-7.

The Court finds Honig's first opinion must be stricken because it is unreliable under the standards set forth in Daubert. Honig's first opinion is improperly predicated upon his subjective beliefs and speculation. See Worrell, 799 F. Supp. 2d at 349 (citation omitted) (noting the "longstanding rule that dictates exclusion of expert testimony" containing bare conclusions unsupported by any factual evidence). In addition, the subject of the opinion is a

15

fact question for the jury and not a proper subject of expert testimony. See Krys v. Aaron, 112 F. Supp. 3d 181, 203 (D.N.J. 2015) ("[E]xperts may not provide testimony concerning 'the state of mind' or 'culpability' of [a party]."). The jury will decide, not Honig, as to whether Kuhar was familiar with the device, whether he was aware of the product's instructions, and in what manner he was using it on the date of the incident. Therefore, for the reasons discussed, the Court strikes opinion one.

    2. Opinion No. 2

Honig's second opinion states as follows:

> At the time of this fall incident, there was no evidence of multiple and redundant safety lines present within the jobsite work area.
>
> In addition, there is no witness corroboration of the presence of redundant safety lines other than the single line that Mr. Kuhar testified he was using at the time of his fall.

Honig Report at 7.

The Court finds Honig's second opinion must be stricken since it is the product of his subject beliefs and speculation, and not a proper subject of expert testimony. The jury, not Honig, will interpret the factual evidence at issue. Thus, for the reasons previously discussed, the Court strikes opinion two.

    3. Opinion No. 3

Honig's third opinion states as follows:

> Mr. Lynch has not provided any reasonable expert engineering explanation for the presence of the 3/16"

> wide gap dimension between the outside face of the Micrograb and the lock nut, which was threaded onto the axle bolt end area.
>
> Given this connection design detail, the reason for providing a steel and nylon-insert lock nut on the axle bolt is to maintain the lock nut in a fixed position, which must be manually adjusted by an external rotational force, such as that provided by an Allen wrench or similar mechanical tool.

Id.

The Court finds Honig's third opinion must be stricken for the same reasons as his first and second opinions, in that, it is a product of his subjective beliefs which is not a proper subject of expert testimony. See Worrell, 799 F. Supp. 2d at 349; see also Holman Enterprises v. Fid. & Guar. Ins. Co., 563 F. Supp. 2d 467, 471 (D.N.J. 2008) ("[I]f an expert opinion is based on speculation or conjecture, it may be stricken."). Further, it is the province of the jury, and not Honig or any expert, to decide whether Kuhar has provided a reasonable explanation for the presence of the 3/16" gap. See Krys, 112 F. Supp. 3d at 203. Thus, for the reasons discussed, the Court strikes opinion three.

    4. Opinion No. 4

Honig's fourth opinion states as follows:

> Based on my structural engineering experience with equipment that incorporates dissimilar materials, such as this Micrograb device, the order of magnitude of external forces required to fracture a high strength steel bolt far exceeds the expected normal use conditions for this type of device. Even the significant gravity forces generated by a personnel fall incident

17

would not be sufficient to cause this bolt connection to fail.

In fact, if the threaded end of this type of bolt were to become so severely overloaded so as to cause bolt end fracture in the manner documented by Micron, there would be related and obvious collateral damage to the Micrograb body. Note that this outcome assumes that the axle bolt has remained within the Micrograb device.

Expected collateral and adjacent metallurgical damage from such a severe bolt overload event would be clearly evident within the softer and larger cast aluminum body portion of the Micrograb device, however, no such damage was documented by Micron.

Honig Report at 7.

The Court finds that Honig's fourth opinion satisfies the Daubert standard because it is sufficiently reliable and fit for the issues in dispute. See Daubert, 509 U.S. at 591; see also Oddi, 234 F.3d at 145-46. Honig testified at the Daubert hearing that he consulted with Drs. Pope and Licurse in formulating his expert report and the opinions contained therein, which included discussions of the relationship of metallurgy to the mechanical configuration and use of the micrograb. See Tr., Aug. 19, 2019 at 40:23-41:7. Based upon his discussions with Drs. Pope and Licurse, and Honig's expertise with metals and equipment incorporating dissimilar materials, Honig reliably opined collateral damage would be expected on the softer, aluminum cast body of the device. See id. at 42:8-19, 47:21-48:4. Honig further testified this opinion was based upon mathematical formulas used to calculate the various strengths and capacities of the different metals. Id. at

43:10-44:14. With over forty years of experience as a structural engineer, and an acquired familiarity with concepts of metallurgy, Honig is qualified to render the opinion. See Oddi, 234 F.3d at 145 (noting that an expert's qualifications "are interpreted liberally"). As such, the Court finds Honig's fourth opinion satisfies Daubert's standard of admissibility.

Plaintiffs objected at the Daubert hearing on the ground that Honig's report fails to include any formulas used to reach his conclusions. However, as the Court already discussed, plaintiffs' objection is without merit. See, e.g., In re Paoli, 35 F.3d at 792; Crowley, 322 F. Supp. 2d at 540. Further, Honig testified that his opinions were reached, in part, by applying mathematical formulas to measurements and data concerning the materials.

**Conclusion**

For all the reasons discussed, the Court finds that the Pope/Licurse Report satisfies Daubert's admissibility standard, but for its passage opining as to the likelihood of where the subject bolt pieces landed. Therefore, the Court will strike that portion of the Pope/Licurse Report.

In addition, the Court finds the Honig Report, in large part, does not meet the admissibility standards set forth in Daubert, but for the fourth opinion contained therein. Therefore, the Court will strike opinions one, two, and three from the Honig Report.

**O R D E R**

Accordingly, for the foregoing reasons,

IT IS HEREBY ORDERED this 12th day of September 2019, that plaintiffs' "Motion to Strike Defendant Uintah's Experts" [Doc. No. 271] is DENIED in part and GRANTED in part; and it is further

ORDERED that plaintiffs' motion is DENIED as to the nine opinions contained in the Pope/Licurse Report at page sixteen (16); and it is further

ORDERED that plaintiffs' motion is DENIED as to opinion four contained in the Honig Report (p. 7); and it is further

ORDERED that plaintiffs' motion is GRANTED as to the opinion contained in the Pope/Licurse Report regarding the likelihood of where the subject bolt pieces landed, which is hereby STRICKEN; and it is further

ORDERED that plaintiffs' motion is GRANTED as to opinions one, two, and three contained in the Honig Report (pp. 6-7), which are hereby STRICKEN.

                                               s/ Joel Schneider
                                               JOEL SCHNEIDER
                                               United States Magistrate Judge